PARK 'N FLY, INC. *v.* DOLLAR PARK AND FLY, INC.

No. 83–1132.   Argued October 9, 1984—Decided January 8, 1985

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 206.

*Alan E. Popkin* argued the cause for petitioner. With him on the briefs was *Timothy F. Noelker*.

*John M. McCormack* argued the cause for respondent. With him on the brief was *J. Pierre Kolisch*.*

---

*\*J. Thomas McCarthy* filed a brief for the American Intellectual Property Law Association et al. as *amici curiae* urging reversal.

JUSTICE O'CONNOR delivered the opinion of the Court.

In this case we consider whether an action to enjoin the infringement of an incontestable trade or service mark may be defended on the grounds that the mark is merely descriptive. We conclude that neither the language of the relevant statutes nor the legislative history supports such a defense.

I

Petitioner operates long-term parking lots near airports. After starting business in St. Louis in 1967, petitioner subsequently opened facilities in Cleveland, Houston, Boston, Memphis, and San Francisco. Petitioner applied in 1969 to the United States Patent and Trademark Office (Patent Office) to register a service mark consisting of the logo of an airplane and the words "Park 'N Fly."[1] The registration issued in August 1971. Nearly six years later, petitioner filed an affidavit with the Patent Office to establish the incontestable status of the mark.[2] As required by § 15 of the Trademark Act of 1946 (Lanham Act), 60 Stat. 433, as amended, 15 U. S. C. § 1065, the affidavit stated that the mark had been registered and in continuous use for five consecutive years, that there had been no final adverse decision to petitioner's claim of ownership or right to registration, and

---

[1] The Trademark Act of 1946 (Lanham Act), 60 Stat. 427, as amended, 15 U. S. C. § 1051 et seq., generally applies the same principles concerning registration and protection to both trade and service marks. See § 3, 15 U. S. C. § 1053. The Lanham Act defines a trademark to include "any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." § 45, 15 U. S. C. § 1127. A service mark is "a mark used in the sale or advertising of services to identify the services of one person and distinguish them from the services of others." Ibid.

[2] Petitioner also applied in 1977 to register a mark consisting only of the words "Park 'N Fly." That mark issued in 1979, but has not become incontestable. The existence of this mark does not affect our resolution of the issues in this case.

that no proceedings involving such rights were pending. Incontestable status provides, subject to the provisions of § 15 and § 33(b) of the Lanham Act, "conclusive evidence of the registrant's exclusive right to use the registered mark . . . ." § 33(b), 15 U. S. C. § 1115(b).

Respondent also provides long-term airport parking services, but only has operations in Portland, Oregon. Respondent calls its business "Dollar Park and Fly." Petitioner filed this infringement action in 1978 in the United States District Court for the District of Oregon and requested the court permanently to enjoin respondent from using the words "Park and Fly" in connection with its business. Respondent counterclaimed and sought cancellation of petitioner's mark on the grounds that it is a generic term. See § 14(c), 15 U. S. C. § 1064(c). Respondent also argued that petitioner's mark is unenforceable because it is merely descriptive. See § 2(e), 15 U. S. C. § 1052(e). As two additional defenses, respondent maintained that it is in privity with a Seattle corporation that has used the expression "Park and Fly" since a date prior to the registration of petitioner's mark, see § 33(b)(5), 15 U. S. C. § 1115(b)(5), and that it has not infringed because there is no likelihood of confusion. See § 32(1), 15 U. S. C. § 1114(1).

After a bench trial, the District Court found that petitioner's mark is not generic and observed that an incontestable mark cannot be challenged on the grounds that it is merely descriptive. App. 75. The District Court also concluded that there was no evidence of privity between respondent and the Seattle corporation. App. 76. Finally, the District Court found sufficient evidence of likelihood of confusion. App. 76. The District Court permanently enjoined respondent from using the words "Park and Fly" and any other mark confusingly similar to "Park 'N Fly." App. 77.

The Court of Appeals for the Ninth Circuit reversed. 718 F. 2d 327 (1983). The District Court did not err, the Court of Appeals held, in refusing to invalidate petitioner's mark. Id., at 331. The Court of Appeals noted, however, that it

previously had held that incontestability provides a defense against the cancellation of a mark, but it may not be used offensively to enjoin another's use. *Ibid.* Petitioner, under this analysis, could obtain an injunction only if its mark would be entitled to continued registration without regard to its incontestable status. Thus, respondent could defend the infringement action by showing that the mark was merely descriptive. Based on its own examination of the record, the Court of Appeals then determined that petitioner's mark is in fact merely descriptive, and therefore respondent should not be enjoined from using the name "Park and Fly." *Ibid.*

The decision below is in direct conflict with the decision of the Court of Appeals for the Seventh Circuit in *Union Carbide Corp.* v. *Ever-Ready, Inc.*, 531 F. 2d 366, cert. denied, 429 U. S. 830 (1976). We granted certiorari to resolve this conflict, 465 U. S. 1078 (1984), and we now reverse.

## II

Congress enacted the Lanham Act in 1946 in order to provide national protection for trademarks used in interstate and foreign commerce. S. Rep. No. 1333, 79th Cong., 2d Sess., 5 (1946). Previous federal legislation, such as the Federal Trademark Act of 1905, 33 Stat. 724, reflected the view that protection of trademarks was a matter of state concern and that the right to a mark depended solely on the common law. S. Rep. No. 1333, at 5. Consequently, rights to trademarks were uncertain and subject to variation in different parts of the country. Because trademarks desirably promote competition and the maintenance of product quality, Congress determined that "a sound public policy requires that trademarks should receive nationally the greatest protection that can be given them." *Id.*, at 6. Among the new protections created by the Lanham Act were the statutory provisions that allow a federally registered mark to become incontestable. §§ 15, 33(b), 15 U. S. C. §§ 1065, 1115(b).

The provisions of the Lanham Act concerning registration and incontestability distinguish a mark that is "the common

descriptive name of an article or substance" from a mark that is "merely descriptive." §§ 2(e), 14(c), 15 U. S. C. §§ 1052(e), 1064(c). Marks that constitute a common descriptive name are referred to as generic. A generic term is one that refers to the genus of which the particular product is a species. *Abercrombie & Fitch Co.* v. *Hunting World, Inc.*, 537 F. 2d 4, 9 (CA2 1976). Generic terms are not registrable, and a registered mark may be canceled at any time on the grounds that it has become generic. See §§ 2, 14(c), 15 U. S. C. §§ 1052, 1064(c). A "merely descriptive" mark, in contrast, describes the qualities or characteristics of a good or service, and this type of mark may be registered only if the registrant shows that it has acquired secondary meaning, *i. e.*, it "has become distinctive of the applicant's goods in commerce." §§ 2(e), (f), 15 U. S. C. §§ 1052(e), (f).

This case requires us to consider the effect of the incontestability provisions of the Lanham Act in the context of an infringement action defended on the grounds that the mark is merely descriptive. Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose. See *American Tobacco Co.* v. *Patterson*, 456 U. S. 63, 68 (1982). With respect to incontestable trade or service marks, § 33(b) of the Lanham Act states that "registration shall be conclusive evidence of the registrant's exclusive right to use the registered mark" subject to the conditions of § 15 and certain enumerated defenses.[3]

---

[3] Section 33(b) of the Lanham Act, as set forth in 15 U. S. C. § 1115(b), provides:

"If the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be conclusive evidence of the registrant's exclusive right to use the registered mark in commerce or in connection with the goods or services specified in the affidavit filed under the provisions of said section 1065 subject to any conditions or limitations stated therein except when one of the following defenses or defects is established:

Section 15 incorporates by reference subsections (c) and (e) of § 14, 15 U. S. C. § 1064. An incontestable mark that becomes generic may be canceled at any time pursuant to § 14(c). That section also allows cancellation of an incontestable mark at any time if it has been abandoned, if it is being used to misrepresent the source of the goods or services in connection with which it is used, or if it was obtained fraudulently or contrary to the provisions of § 4, 15 U. S. C. § 1054, or §§ 2(a)–(c), 15 U. S. C. §§ 1052(a)–(c).[4]

"(1) That the registration or the incontestable right to use the mark was obtained fraudulently; or

"(2) That the mark has been abandoned by the registrant; or

"(3) That the registered mark is being used, by or with the permission of the registrant or a person in privity with the registrant, so as to misrepresent the source of the goods or services in connection with which the mark is used; or

"(4) That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a trade or service mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe to users the goods or services of such party, or their geographic origin; or

"(5) That the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to registration of the mark under this chapter or publication of the registered mark under subsection (c) of section 1062 of this title: *Provided, however,* That this defense or defect shall apply only for the area in which such continuous prior use is proved; or

"(6) That the mark whose use is charged as an infringement was registered and used prior to the registration under this chapter or publication under subsection (c) of section 1062 of this title of the registered mark of the registrant, and not abandoned: *Provided, however,* That this defense or defect shall apply only for the area in which the mark was used prior to such registration or such publication of the registrant's mark; or

"(7) That the mark has been or is being used to violate the antitrust laws of the United States."

[4] Sections 2(a)–(c) prohibit registration of marks containing specified subject matter, *e. g.*, the flag of the United States. Sections 4 and 14(e) concern certification marks and are inapplicable to this case.

One searches the language of the Lanham Act in vain to find any support for the offensive/defensive distinction applied by the Court of Appeals. The statute nowhere distinguishes between a registrant's offensive and defensive use of an incontestable mark. On the contrary, § 33(b)'s declaration that the registrant has an "exclusive right" to use the mark indicates that incontestable status may be used to enjoin infringement by others. A conclusion that such infringement cannot be enjoined renders meaningless the "exclusive right" recognized by the statute. Moreover, the language in three of the defenses enumerated in § 33(b) clearly contemplates the use of incontestability in infringement actions by plaintiffs. See §§ 33(b)(4)–(6), 15 U. S. C. §§ 1115(b)(4)–(6).

The language of the Lanham Act also refutes any conclusion that an incontestable mark may be challenged as merely descriptive. A mark that is merely descriptive of an applicant's goods or services is not registrable unless the mark has secondary meaning. Before a mark achieves incontestable status, registration provides prima facie evidence of the registrant's exclusive right to use the mark in commerce. § 33(a), 15 U. S. C. § 1115(a). The Lanham Act expressly provides that before a mark becomes incontestable an opposing party may prove any legal or equitable defense which might have been asserted if the mark had not been registered. *Ibid.* Thus, § 33(a) would have allowed respondent to challenge petitioner's mark as merely descriptive if the mark had not become incontestable. With respect to incontestable marks, however, § 33(b) provides that registration is *conclusive* evidence of the registrant's exclusive right to use the mark, subject to the conditions of § 15 and the seven defenses enumerated in § 33(b) itself. Mere descriptiveness is not recognized by either § 15 or § 33(b) as a basis for challenging an incontestable mark.

The statutory provisions that prohibit registration of a merely descriptive mark but do not allow an incontestable

mark to be challenged on this ground cannot be attributed to inadvertence by Congress. The Conference Committee rejected an amendment that would have denied registration to any descriptive mark, and instead retained the provisions allowing registration of a merely descriptive mark that has acquired secondary meaning. See H. R. Conf. Rep. No. 2322, 79th Cong., 2d Sess., 4 (1946) (explanatory statement of House managers). The Conference Committee agreed to an amendment providing that no incontestable right can be acquired in a mark that is a common descriptive, i. e., generic, term. Id., at 5. Congress could easily have denied incontestability to merely descriptive marks as well as to generic marks had that been its intention.

The Court of Appeals in discussing the offensive/defensive distinction observed that incontestability protects a registrant against cancellation of his mark. 718 F. 2d, at 331. This observation is incorrect with respect to marks that become generic or which otherwise may be canceled at any time pursuant to §§ 14(c) and (e). Moreover, as applied to marks that are merely descriptive, the approach of the Court of Appeals makes incontestable status superfluous. Without regard to its incontestable status, a mark that has been registered five years is protected from cancellation except on the grounds stated in §§ 14(c) and (e). Pursuant to § 14, a mark may be canceled on the grounds that it is merely descriptive only if the petition to cancel is filed within five years of the date of registration. § 14(a), 15 U. S. C. § 1064(a). The approach adopted by the Court of Appeals implies that incontestability adds nothing to the protections against cancellation already provided in § 14. The decision below not only lacks support in the words of the statute; it effectively emasculates § 33(b) under the circumstances of this case.

## III

Nothing in the legislative history of the Lanham Act supports a departure from the plain language of the statutory

provisions concerning incontestability.  Indeed, a conclusion that incontestable status can provide the basis for enforcement of the registrant's exclusive right to use a trade or service mark promotes the goals of the statute.   The Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers.   See S. Rep. No. 1333, at 3, 5.   National protection of trademarks is desirable, Congress concluded, because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation.   *Id.*, at 4.   The incontestability provisions, as the proponents of the Lanham Act emphasized, provide a means for the registrant to quiet title in the ownership of his mark.   See Hearings on H. R. 82 before the Subcommittee of the Senate Committee on Patents, 78th Cong., 2d Sess., 21 (1944) (remarks of Rep. Lanham); *id.*, at 21, 113 (testimony of Daphne Robert, ABA Committee on Trade Mark Legislation); Hearings on H. R. 102 et al. before the Subcommittee on Trade-Marks of the House Committee on Patents, 77th Cong., 1st Sess., 73 (1941) (remarks of Rep. Lanham).   The opportunity to obtain incontestable status by satisfying the requirements of § 15 thus encourages producers to cultivate the goodwill associated with a particular mark.   This function of the incontestability provisions would be utterly frustrated if the holder of an incontestable mark could not enjoin infringement by others so long as they established that the mark would not be registrable but for its incontestable status.

Respondent argues, however, that enforcing petitioner's mark would conflict with the goals of the Lanham Act because the mark is merely descriptive and should never have been registered in the first place.[5]   Representative Lanham,

---

[5] The dissent similarly takes the position that the mark was improperly issued because it was descriptive and petitioner failed to prove that it had

respondent notes, explained that the defenses enumerated in § 33(b) were "not intended to enlarge, restrict, amend, or modify the substantive law of trademarks either as set out in other sections of the act or as heretofore applied by the courts under prior laws." 92 Cong. Rec. 7524 (1946). Respondent reasons that because the Lanham Act did not alter the substantive law of trademarks, the incontestability provisions cannot protect petitioner's use of the mark if it were not originally registrable. Moreover, inasmuch as petitioner's mark is merely descriptive, respondent contends that enjoining others from using the mark will not encourage competition by assisting consumers in their ability to distinguish among competing producers.

These arguments are unpersuasive. Representative Lanham's remarks, if read in context, clearly refer to the effect of the *defenses* enumerated in § 33(b).[6] There is no question that the Lanham Act altered existing law concerning trademark rights in several respects. For example, § 22,

---

secondary meaning. *Post*, at 206–207. Neither the District Court nor the Court of Appeals made any finding whether the mark was properly issued in 1971. After the Patent Office denied the initial application for registration in 1970, petitioner filed a request for reconsideration arguing that the mark was not descriptive. App. 54–56. The Patent Office subsequently granted registration without specifying whether the mark had secondary meaning or instead was not descriptive. *Id.*, at 57–59. Unlike the dissent, we decline to determine in the first instance whether the mark improperly issued. Our holding is not affected by the possibility that the mark was or has become merely descriptive.

[6] Representative Lanham made his remarks to clarify that the seven defenses enumerated in § 33(b) are not substantive rules of law which go to the validity or enforceability of an incontestable mark. 92 Cong. Rec. 7524 (1946). Instead, the defenses affect the evidentiary status of registration where the owner claims the benefit of a mark's incontestable status. If one of the defenses is established, registration constitutes only prima facie and not conclusive evidence of the owner's right to exclusive use of the mark. *Ibid.* See also H. R. Conf. Rep. No. 2322, 79th Cong., 2d Sess., 6 (1946) (explanatory statement of House managers).

15 U. S. C. § 1072, provides for constructive notice of registration and modifies the common-law rule that allowed acquisition of concurrent rights by users in distinct geographic areas if the subsequent user adopted the mark without knowledge of prior use. See *Hanover Star Milling Co.* v. *Metcalf*, 240 U. S. 403, 415–416 (1916) (describing pre-Lanham Act law). Similarly, § 14 cuts off certain grounds for cancellation five years after registration and thereby modifies the previous rule that the validity of a trademark could be attacked at any time. See *White House Milk Products Co.* v. *Dwinell-Wright Co.*, 27 C. C. P. A. (Pat.) 1194, 111 F. 2d 490 (1940). Most significantly, Representative Lanham himself observed that incontestability was one of "the valuable new rights created by the act." 92 Cong. Rec. 7524 (1946).

Respondent's argument that enforcing petitioner's mark will not promote the goals of the Lanham Act is misdirected. Arguments similar to those now urged by respondent were in fact considered by Congress in hearings on the Lanham Act. For example, the United States Department of Justice opposed the incontestability provisions and expressly noted that a merely descriptive mark might become incontestable. Hearings on H. R. 82, at 59–60 (statement of the U. S. Dept. of Justice). This result, the Department of Justice observed, would "go beyond existing law in conferring unprecedented rights on trade-mark owners," and would undesirably create an exclusive right to use language that is descriptive of a product. *Id.*, at 60; see also Hearings on H. R. 102, at 106–107, 109–110 (testimony of Prof. Milton Handler); *id.*, at 107, 175 (testimony of attorney Louis Robertson). These concerns were answered by proponents of the Lanham Act, who noted that a merely descriptive mark cannot be registered unless the Commissioner finds that it has secondary meaning. *Id.*, at 108, 113 (testimony of Karl Pohl, U. S. Trade Mark Assn.). Moreover, a mark can be challenged for

five years prior to its attaining incontestable status. *Id.*, at 114 (remarks of Rep. Lanham). The supporters of the incontestability provisions further observed that a generic mark cannot become incontestable and that § 33(b)(4) allows the nontrademark use of descriptive terms used in an incontestable mark. *Id.*, at 110–111 (testimony of Wallace Martin, chairman, ABA Committee on Trade Mark Legislation).

The alternative of refusing to provide incontestable status for descriptive marks with secondary meaning was expressly noted in the hearings on the Lanham Act. *Id.*, at 64, 69 (testimony of Robert Byerley, New York Patent Law Assn.); Hearings on S. 895 before the Subcommittee of the Senate Committee on Patents, 77th Cong., 2d Sess., 42 (1942) (testimony of Elliot Moyer, Special Assistant to the Attorney General). Also mentioned was the possibility of including as a defense to infringement of an incontestable mark the "fact that a mark is a descriptive, generic, or geographical term or device." *Id.*, at 45, 47. Congress, however, did not adopt either of these alternatives. Instead, Congress expressly provided in §§ 33(b) and 15 that an incontestable mark could be challenged on specified grounds, and the grounds identified by Congress do not include mere descriptiveness.

The dissent echoes arguments made by opponents of the Lanham Act that the incontestable status of a descriptive mark might take from the public domain language that is merely descriptive. *Post*, at 214–216. As we have explained, Congress has already addressed concerns to prevent the "commercial monopolization," *post*, at 214, of descriptive language. The Lanham Act allows a mark to be challenged at any time if it becomes generic, and, under certain circumstances, permits the nontrademark use of descriptive terms contained in an incontestable mark. Finally, if "monopolization" of an incontestable mark threatens economic competition, § 33(b)(7), 15 U. S. C. § 1115(b)(7), provides a defense on the grounds that the mark is being used to violate federal

antitrust laws. At bottom, the dissent simply disagrees with the balance struck by Congress in determining the protection to be given to incontestable marks.

## IV

Respondent argues that the decision by the Court of Appeals should be upheld because trademark registrations are issued by the Patent Office after an *ex parte* proceeding and generally without inquiry into the merits of an application. This argument also unravels upon close examination. The facts of this case belie the suggestion that registration is virtually automatic. The Patent Office initially denied petitioner's application because the examiner considered the mark to be merely descriptive. Petitioner sought reconsideration and successfully persuaded the Patent Office that its mark was registrable.

More generally, respondent is simply wrong to suggest that third parties do not have an opportunity to challenge applications for trademark registration. If the Patent Office examiner determines that an applicant appears to be entitled to registration, the mark is published in the Official Gazette. § 12(a), 15 U. S. C. § 1062(a). Within 30 days of publication, any person who believes that he would be damaged by registration of the mark may file an opposition. § 13, 15 U. S. C. § 1063. Registration of a mark provides constructive notice throughout the United States of the registrant's claim to ownership. § 22, 15 U. S. C. § 1072. Within five years of registration, any person who believes that he is or will be damaged by registration may seek to cancel a mark. § 14(a), 15 U. S. C. § 1064(a). A mark may be canceled at any time for certain specified grounds, including that it was obtained fraudulently or has become generic. § 14(c), 15 U. S. C. § 1064(c).

The Lanham Act, as the dissent notes, *post,* at 217, authorizes courts to grant injunctions "according to principles of equity." § 34, 15 U. S. C. § 1116. Neither respondent nor the opinion of the Court of Appeals relies on this provi-

sion to support the holding below. Whatever the precise boundaries of the courts' equitable power, we do not believe that it encompasses a substantive challenge to the validity of an incontestable mark on the grounds that it lacks secondary meaning. To conclude otherwise would expand the meaning of "equity" to the point of vitiating the more specific provisions of the Lanham Act.[7] Similarly, the power of the courts to cancel registrations and "to otherwise rectify the register," § 37, 15 U. S. C. § 1119, must be subject to the specific provisions concerning incontestability. In effect, both respondent and the dissent argue that these provisions offer insufficient protection against improper registration of a merely descriptive mark, and therefore the validity of petitioner's mark may be challenged notwithstanding its incontestable status. Our responsibility, however, is not to evaluate the wisdom of the legislative determinations reflected in the statute, but instead to construe and apply the provisions that Congress enacted.

## V

The Court of Appeals did not attempt to justify its decision by reference to the language or legislative history of the Lanham Act. Instead, the court relied on its previous decision in *Tillamook County Creamery* v. *Tillamook Cheese & Dairy Assn.*, 345 F. 2d 158, 163 (CA9), cert. denied, 382 U. S. 903 (1965), for the proposition that a registrant may not rely on incontestability to enjoin the use of the mark by others. Examination of *Tillamook*, however, reveals that there is no persuasive justification for the judicially created distinction between offensive and defensive use of an incontestable mark.

---

[7] We note, however, that we need not address in this case whether traditional equitable defenses such as estoppel or laches are available in an action to enforce an incontestable mark. See generally Comment, Incontestable Trademark Rights and Equitable Defenses in Infringement Litigation, 66 Minn. L. Rev. 1067 (1982).

*Tillamook* discussed in dicta the offensive/defensive distinction and observed that incontestability protects a registrant against cancellation but cannot be used to obtain relief from an infringing use. *Tillamook*'s authority for this proposition was *John Morrell & Co.* v. *Reliable Packing Co.*, 295 F. 2d 314, 316 (CA7 1961), which did reverse a finding of infringement on the grounds that incontestable status confers only defensive rights. The Court of Appeals for the Seventh Circuit based its holding in *John Morrell* on *Rand McNally & Co.* v. *Christmas Club*, 105 U. S. P. Q. 499 (1955), aff'd, 44 C. C. P. A. 861 (Pat.), 242 F. 2d 776 (1957), but the latter case did not in fact involve the use of an incontestable mark in an enforcement action.

The Patent Office in *Rand McNally* denied a petition to cancel a mark challenged as merely descriptive. The petitioner feared that if the mark became incontestable, use of the same mark in connection with a service different from the one specified in the registration could be enjoined. 105 U. S. P. Q., at 500. The Assistant Commissioner of Patents answered this concern by observing that an incontestable mark does not provide the registrant "with an 'offensive weapon' of any greater magnitude than that which it has had since the registration issued. . . ." *Id.*, at 501. These comments do not suggest that incontestability may never provide the basis for injunctive relief, but instead indicate that a mark may not be expanded beyond the good or service for which it was originally designated.

*John Morrell*, the judicial authority providing the most direct support for the decision below, was subsequently overruled in *Union Carbide Corp.* v. *Ever-Ready, Inc.*, 531 F. 2d 366 (CA7), cert. denied, 429 U. S. 830 (1976). In *Union Carbide* the Court of Appeals for the Seventh Circuit acknowledged that its earlier decision in *John Morrell* was unsupported by the language or legislative history of the Lanham Act and had been based on a misreading of *Rand McNally*. 531 F. 2d, at 373, 377. A registrant may rely on

the incontestable status of the mark in an infringement action, *Union Carbide* concluded, and a "'[d]efendant faced with an incontestable registered mark cannot defend by claiming that the mark is invalid because it is descriptive.'" *Id.*, at 377 (quoting 1 J. McCarthy, Trademarks and Unfair Competition § 11.16, p. 377 (1st ed. 1973)).

Other courts have subsequently followed *Union Carbide* and concluded that a plaintiff may rely on the incontestable status of a trade or service mark in an infringement action. See, *e. g.*, *United States Jaycees* v. *Philadelphia Jaycees*, 639 F. 2d 134, 137 (CA3 1981); *Soweco, Inc.* v. *Shell Oil Co.*, 617 F. 2d 1178, 1184–1185 (CA5 1980), cert. denied, 450 U. S. 981 (1981). The Patent Office has also rejected any offensive/defensive distinction with respect to the use of an incontestable mark. See *Ansul Co.* v. *Malter International Corp.*, 199 U. S. P. Q. 596, 599–600 (TTAB 1978). Thus, the doctrine relied on by the Court of Appeals in this case is best described as flawed in its origin and subsequently discredited by its progenitors.

## VI

We conclude that the holder of a registered mark may rely on incontestability to enjoin infringement and that such an action may not be defended on the grounds that the mark is merely descriptive. Respondent urges that we nevertheless affirm the decision below based on the "prior use" defense recognized by § 33(b)(5) of the Lanham Act. Alternatively, respondent argues that there is no likelihood of confusion and therefore no infringement justifying injunctive relief. The District Court rejected each of these arguments, but they were not addressed by the Court of Appeals. 718 F. 2d, at 331–332, n. 4. That court may consider them on remand. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

In trademark law, the term "incontestable" is itself somewhat confusing and misleading because the Lanham Act expressly identifies over 20 situations in which infringement of an allegedly incontestable mark is permitted.[1] Moreover, in § 37 of the Act, Congress unambiguously authorized judicial review of the validity of the registration "in any action involving a registered mark."[2] The problem in this case arises because of petitioner's attempt to enforce as "incontestable" a mark that Congress has plainly stated is inherently unregistrable.

The mark "Park 'N Fly" is at best merely descriptive in the context of airport parking.[3] Section 2 of the Lanham Act

---

[1] Section 33(b) enumerates seven categories of defenses to an action to enforce an incontestable mark. See 15 U. S. C. § 1115(b), quoted *ante*, at 194, n. 3. In addition, a defendant is free to argue that a mark should never have become incontestable for any of the four reasons enumerated in § 15. 15 U. S. C. § 1065. Moreover, § 15 expressly provides that an incontestable mark may be challenged on any of the grounds set forth in subsections (c) and (e) of § 14, 15 U. S. C. § 1064, and those sections, in turn, incorporate the objections to registrability that are defined in §§ 2(a), 2(b), and 2(c) of the Act. 15 U. S. C. §§ 1052(a), (b), and (c).

[2] Section 37, in pertinent part, provides:

"In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action." 15 U. S. C. § 1119.

[3] In the Court of Appeals petitioner argued that its mark was suggestive with respect to airport parking lots. The Court of Appeals responded: "We are unpersuaded. Given the clarity of its first word, Park 'N Fly's mark seen in context can be understood readily by consumers as an offering of airport parking—imagination, thought, or perception is not needed. Simply understood, 'park and fly' is a clear and concise description of a characteristic or ingredient of the service offered—the customer parks his car and flies from the airport. We conclude that Park 'N Fly's mark used in the context of airport parking is, at best, a merely descriptive mark." 718 F. 2d 327, 331 (CA9 1983).

Although the Court appears to speculate that even though the mark is now merely descriptive it might not have been merely descriptive in 1971

plainly prohibits the registration of such a mark unless the applicant proves to the Commissioner of the Patent and Trademark Office that the mark "has become distinctive of the applicant's goods in commerce," or to use the accepted shorthand, that it has acquired a "secondary meaning." See 15 U. S. C. §§ 1052(e), (f). Petitioner never submitted any such proof to the Commissioner, or indeed to the District Court in this case. Thus, the registration plainly violated the Act.

The violation of the literal wording of the Act also contravened the central purpose of the entire legislative scheme. Statutory protection for trademarks was granted in order to safeguard the goodwill that is associated with particular enterprises.[4] A mark must perform the function of distinguishing the producer or provider of a good or service in order to have any legitimate claim to protection. A merely descriptive mark that has not acquired secondary meaning does not perform that function because it simply "describes the qualities or characteristics of a good or service." *Ante*, at 194. No legislative purpose is served by granting anyone a monopoly in the use of such a mark.

Instead of confronting the question whether an inherently unregistrable mark can provide the basis for an injunction against alleged infringement, the Court treats the case as though it presented the same question as *Union Carbide Corp.* v. *Ever-Ready, Inc.*, 531 F. 2d 366 (CA7), cert. denied, 429 U. S. 830 (1976), a case in which the merely descriptive mark had an obvious and well-established secondary meaning. In such a case, I would agree with the Court that the descriptive character of the mark does not provide an infringer with a defense. In this case, however, the provisions

when it was first registered, see *ante*, at 198–199, n. 5, I find such speculation totally unpersuasive. But even if the Court's speculation were valid, the entire rationale of its opinion is based on the assumption that the mark is in the "merely descriptive" category. See, for example, the statement of the question presented, *ante*, at 191.

[4] S. Rep. No. 1333, 79th Cong., 2d Sess., 5 (1946).

of the Act dealing with incontestable marks do not support the result the Court has reached. I shall first explain why I agree with the conclusion that the Court of Appeals reached; I shall then comment on each of the three arguments that the Court advances in support of its contrary conclusion.

I

The word "incontestable" is not defined in the Act. Nor, surprisingly, is the concept explained in the Committee Reports on the bill that was enacted in 1946.[5] The word itself implies that it was intended to resolve potential contests between rival claimants to a particular mark. And, indeed, the testimony of the proponents of the concept in the Committee hearings that occurred from time to time during the period when this legislation was being considered reveals that they were primarily concerned with the problem that potential contests over the ownership of registrable marks might present.[6] No one ever suggested that any public purpose would be served by granting incontestable status to a mark that should never have been accepted for registration in the first instance.

In those hearings the witnesses frequently referred to incontestability as comparable to a decree quieting title to real property.[7] Such a decree forecloses any further contest over ownership of the property, but it cannot create the property itself. Similarly the incontestability of a trade-

---

[5] See S. Rep. No. 1333, 79th Cong., 2d Sess. (1946); H. R. Conf. Rep. No. 2322, 79th Cong., 2d Sess. (1946).

[6] Hearing on H. R. 102, H. R. 5461, and S. 895 before the Subcommittee on Trade-Marks of the House Committee on Patents, 77th Cong., 1st Sess., 48 (1941) (statement of Charles Kramer, Chairman, House Committee on Patents); id., at 51, 193–194.

[7] Hearings on H. R. 82 before the Subcommittee of the Senate Committee on Patents, 78th Cong., 2d Sess., 21 (1944) (statements of Rep. Lanham); id., at 21, 112 (testimony of Daphne Robert, ABA Committee on Trade Mark Legislation); Hearings on H. R. 102, H. R. 5461, and S. 895, supra, at 73 (statements of Rep. Lanham).

mark precludes any competitor from contesting the registrant's ownership, but cannot convert unregistrable subject matter into a valid mark. Such a claim would be clearly unenforceable.[8]

The case that petitioner principally urges in support of reversal, *Union Carbide Corp.* v. *Ever-Ready, Inc., supra,* does not conflict with this simple proposition. The court there was dealing with a contest between two companies over the name "Eveready." There was no question that the name had acquired a well-established secondary meaning, although it was not originally registered under § 1052(f).[9] The problem presented in such a case is properly resolved by

---

[8] This distinction is not new. In 1875 and 1883 Great Britain enacted statutes which provided, in essence, that registration was conclusive evidence of the registrant's right to the exclusive use of the mark after the expiration of five years following registration. See An Act to Establish a Register of Trade Marks, 38 & 39 Vict., ch. 91, § 3 (1875); An Act to Amend and Consolidate the Law Relating to Patents for Inventions, Registration of Designs, and of Trade Marks,.46 & 47 Vict., ch. 57, § 76 (1883). Those statutes did not use the word "incontestable," but in other respects there is a striking similarity between the language of those Acts and the relevant provision of the Lanham Act that we construe today. It is noteworthy that the English judges refused to give the statutory language its plain meaning if a showing was made that the mark had not been properly registered in the beginning. See *Edwards* v. *Dennis*, 30 Ch. D. 454 (1885); *Jackson & Co.* v. *Napper (Re Schmidt's Trade-Mark)*, 4 Rep. Pat. Cas. 45 (1886); cf. *In re J. B. Palmer's Trade-Mark*, 24 Ch. D. 504 (1883).

[9] Although its conclusion regarding secondary meaning was contained in an alternative holding, it seems clear that the distinctiveness of the mark heavily influenced the Court of Appeals' disposition regarding incontestability. The court wrote:

"[W]e find it difficult to believe that anyone living in our society, which has daily familiarity with hundreds of battery-operated products, can be other than thoroughly acquainted with the EVEREADY mark. While perhaps not many know that Carbide is the manufacturer of EVEREADY products, few would have any doubt that the term was being utilized other than to indicate the single, though anonymous, source. A court should not play the ostrich with regard to such general public knowledge." 531 F. 2d, at 381.

giving effect to the incontestable language of the Act, but a wholly different question is presented when the record establishes that a mark should not have been registered at all.

The legislative history of the incontestability provisions indicates that Congress did not intend to prevent the use of mere descriptiveness as a substantive defense to a claim of infringement if the mark has not acquired secondary meaning. The testimony in the Committee hearings concerning the public interest in preventing the grant of monopoly privileges in the use of merely descriptive phrases expressly relied on the administrative practice that was incorporated into §2(f), 15 U. S. C. § 1052(f),[10] as a protection against the improper registration of merely descriptive marks. Thus, Dr. Karl Pohl testified:

> "On the question of so-called nontechnical trademarks, Professor Handler assumes that they have been improperly registered.
> "Now, where does that idea originate?
> "They have very carefully circumscribed procedure for getting these marks on the register. It will by no means be easy, Mr. Chairman and gentlemen of the committee, it will be exceedingly difficult to get these descriptive words on the register. The Patent Office will, in the first place, reject them, and you will have

---

[10] As I have already noted, § 2(e), 15 U. S. C. § 1052(e), expressly prohibits the registration of a merely descriptive mark. The exception from that prohibition, which petitioner did not satisfy in processing its application, reads as follows:

"Except as expressly excluded in paragraphs (a), (b), (c), and (d) of this section, nothing in this chapter shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce. The Commissioner may accept as prima facie evidence that the mark has become distinctive, as applied to the applicant's goods in commerce, *proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years next preceding the date of the filing of the application for its registration.*" 15 U. S. C. § 1052(f) (emphasis added).

to submit a substantial body of evidence that these words by long-continued usage, have acquired a secondary meaning, and by that long-continued usage have acquired that special status which entitles them to be protected in their secondary meaning sense.

"Therefore, to call these marks improperly registered trade-marks is, I believe, a misnomer.

"Now, if you look at the problem from that point of view, you will see that the apprehensions of Mr. Handler are more or less obviated. I believe personally that they are completely obviated, but as to nontechnical trade-marks and only a very carefully circumscribed number of trade-marks will be entitled to that protection." [11]

The record in this case demonstrates that Professor Handler's concern was justified, and that Dr. Pohl's assurance to the Committee was somewhat misleading; for the "Park 'N Fly" mark issued without any evidence of secondary meaning having been presented to the Patent and Trademark Office. In light of this legislative history, it is apparent that Congress could not have intended that incontestability should preserve a merely descriptive trademark from challenge when the statutory procedure for establishing secondary meaning was not followed and when the record still contains no evidence that the mark has ever acquired a secondary meaning.

If the registrant of a merely descriptive mark complies with the statutory requirement that prima facie evidence of secondary meaning must be submitted to the Patent and Trademark Office, it is entirely consistent with the policy of the Act to accord the mark incontestable status after an addi-

---

[11] Hearings on H. R. 102, H. R. 5461, and S. 895 before the Subcommittee on Trade-Marks of the House Committee on Patents, *supra* n. 6, at 113. Dr. Pohl appeared in the hearings on behalf of the New York Merchants' Association Trade-mark Committee and was a member of the Co-ordination Committee. *Id.*, at 136.

tional five years of continued use. For if no rival contests the registration in that period, it is reasonable to presume that the initial prima facie showing of distinctiveness could not be rebutted. But if no proof of secondary meaning is ever presented, either to the Patent and Trademark Office or to a court, there is simply no rational basis for leaping to the conclusion that the passage of time has transformed an inherently defective mark into an incontestable mark.

No matter how dedicated and how competent administrators may be, the possibility of error is always present,[12] especially in nonadversary proceedings.[13] For that reason

---

[12] Recently, Gerald J. Mossinghoff, Assistant Secretary and Commissioner of Patents and Trademarks, gave the following testimony before Congress:

"[O]ne of the biggest problems we have had is that, at any one time, about 7 percent of our 25 million documents are either missing or misfiled. The paper system was set up in 1836 and has remained virtually unchanged since then. During that time it simply has deteriorated to the point where 7 percent of the documents are missing." Hearing before the Subcommittee on Patents, Copyrights and Trademarks of the Senate Committee on the Judiciary, 98th Cong., 1st Sess., 5 (1983).

[13] One treatise gives the following "advice" regarding registration:

"Registration on the Principal Register should be attempted if it is at all possible. As a matter of strategy, an applicant should not in the application concede that the term falls within any of the statutory bars of § 2(e) which require proof of secondary meaning under § 2(f). The applicant should let the Trademark Examiner prove that the term falls within one of the categories of § 2(e). Since an ex parte application is like a contested proceeding between the applicant and the Federal Government, the applicant can merely await the Examiner's response and possible contention that the mark requires proof of secondary meaning. If the Examiner never makes this contention, or if the applicant convinces the Examiner or Trademark Board that the mark does not fall within § 2(e), then the whole problem of § 2(f) proof of secondary meaning is avoided. If the Examiner is adamant in his or her argument that the mark falls within a § 2(e) category, then the applicant has several choices: He may appeal the determination: he may agree to have the mark registered on the Supplemental Register; or he may submit proof under § 2(f) of secondary meaning. If the applicant qualifies for registration on the Supplemental Register, he

the Court normally assumes that Congress intended agency action to be subject to judicial review unless the contrary intent is expressed in clear and unambiguous language.[14] In this statute Congress has expressed no such intent. On the contrary, it has given the courts the broadest possible authority to determine the validity of trademark registrations "in any action involving a registered mark."[15] The exercise of that broad power of judicial review should be informed by the legislative purposes that motivated the enactment of the Lanham Act.[16]

Congress enacted the Lanham Act "to secure trade-mark owners in the goodwill which they have built up."[17] But without a showing of secondary meaning, there is no basis upon which to conclude that petitioner has built up any goodwill that is secured by the mark "Park 'N Fly." In fact, without a showing of secondary meaning, we should presume

---

may thereafter apply to register the mark on the Principal Register, and perhaps rely on the five-year presumption on secondary meaning. After the examiner's initial response that the mark is barred by a § 2(e) ground, as being not inherently distinctive, there is no doubt that applicant may respond in the alternative. That is, applicant may argue that (1) the mark is inherently distinctive (e. g., is not 'merely descriptive') and/or (2) that even if barred by a § 2(e) ground as not inherently distinctive, the mark has become distinctive through the acquisition of secondary meaning. *The point is that the applicant's attorney should not concede any more weakness in the mark than is absolutely necessary. The object is to get the mark on the Principal Register as soon as possible, one way or another."* 1 J. McCarthy, Trademarks and Unfair Competition § 19:7 (1984) (emphasis added).

[14] *United States* v. *Erika,* 456 U. S. 201, 208 (1982); *Dunlop* v. *Bachowski,* 421 U. S. 560, 567 (1975); *Johnson* v. *Robison,* 415 U. S. 361, 373–374 (1974); *Barlow* v. *Collins,* 397 U. S. 159, 166 (1970); *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 140–141 (1967).

[15] § 37, 15 U. S. C. § 1119.

[16] Cf. *Stafford* v. *Briggs,* 444 U. S. 527, 536 (1980) (the Court should look to the statutory language, and the objects and policy of the law, so that the Court's construction of the statute will execute Congress' true intent).

[17] S. Rep. No. 1333, *supra* n. 4, at 5.

that petitioner's business appears to the consuming public to be just another anonymous, indistinguishable parking lot. When enacting the Lanham Act, Congress also wanted to "protect the public from imposition by the use of counterfeit and imitated marks and false trade descriptions." [18] Upon this record there appears no danger of this occurrence, and as a practical matter, without any showing that the public can specifically identify petitioner's service, it seems difficult to believe that anyone would imitate petitioner's marks, or that such imitation, even if it occurred, would be likely to confuse anybody. [19]

On the basis of the record in this case, it is reasonable to infer that the operators of parking lots in the vicinity of airports may make use of the words "park and fly" simply because those words provide a ready description of their businesses, rather than because of any desire to exploit petitioner's goodwill. [20] There is a well-recognized public interest in prohibiting the commercial monopolization of

---

[18] *Ibid.*

[19] Respondent did raise the issue of "no likelihood of confusion justifying an injunction insofar as [petitioner] has no present intention of expanding into the Pacific Northwest." Because of its disposition, the Court of Appeals did not reach this issue. 718 F. 2d, at 331–332, n. 4.

[20] The Patent and Trademark Office's own handbook explains this point in general terms:

"Matter which merely describes the goods or services to which it is applied is prohibited from being registered on the Principal Register. First, to permit one person to appropriate exclusively a mark which is merely the ordinary language to describe the goods or services involved would obviously be detrimental to others who deal in the same goods or services by hindering their use of normal language in association with their goods or services. Second, there would be no assurance that a mark which merely describes would in fact be a mark indicating origin, since the purchasing public would be likely to recognize only the descriptive meaning of the matter as it would be to accord to it any significance as indicating a single source of origin of the goods or services." U. S. Department of Commerce, Patent and Trademark Office, Trademark Manual of Examining Procedure 144 (1983).

phrases such as "park and fly." When a business claims the exclusive right to use words or phrases that are a part of our common vocabulary, this Court should not depart from the statutorily mandated authority to "rectify the register," 15 U. S. C. § 1119, absent a clear congressional mandate. Language, even in a commercial context, properly belongs to the public unless Congress instructs otherwise.[21] In this case we have no such instruction; in fact, the opposite command guides our actions: Congress' clear insistence that a merely descriptive mark, such as "Park 'N Fly" in the context of airport parking, remain in the public domain unless secondary meaning is proved.

The basic purposes of the Act, the unambiguous congressional command that no merely descriptive mark should be registered without prior proof that it acquired secondary meaning, and the broad power of judicial review granted by § 37 combine to persuade me that the registrant of a merely descriptive mark should not be granted an injunction against

---

[21] See *Otto Roth & Co.* v. *Universal Foods Corp.*, 640 F. 2d 1317, 1320 (CCPA 1981)(recognizing the importance of the "free use of the language" in the trademark context); *Bada Co.* v. *Montgomery Ward & Co.*, 426 F. 2d 8, 11 (CA9) ("[O]ne competitor will not be permitted to impoverish the language of commerce by preventing his fellows from fairly describing their own goods"), cert. denied, 400 U. S. 916 (1970). Additionally, before the Lanham Act was enacted, this Court, in *Canal Co.* v. *Clark*, 13 Wall. 311, 323–324 (1872), wrote words that are still applicable today:

" '[T]he owner of an original trade-mark has an undoubted right to be protected in the exclusive use of all the marks, forms, or symbols, that were appropriated as designating the true origin or ownership of the article or fabric to which they were affixed; but he has no right to the exclusive use of any words, letters, figures, or symbols, which have no relation to the origin or ownership of the goods, but are only meant to indicate their name or quality. He has no right to appropriate a sign or symbol which, from the nature of the fact it is used to signify, others may employ with equal truth, and therefore have an equal right to employ for the same purpose.' " (Quoting *Amoskeag Manufacturing Co.* v. *Spear*, 2 Sand. 599, 606–607 (N. Y. Super. 1849).)

infringement without ever proving that the mark acquired secondary meaning.

## II

The Court relies on three different, though not unrelated, arguments to support its negative answer to the question "whether an action to enjoin the infringement of an incontestable mark may be defended on the grounds that the mark is merely descriptive," *ante*, at 191: (1) the language of § 33(b) is too plain to prevent any other conclusion; (2) the legislative history indicates that Congress decided not to deny incontestable status to merely descriptive marks; and (3) the practical value of incontestable status would be nullified if the defense were recognized. Each of these arguments is unpersuasive.

### The Plain Language

After the right to use a registered mark has become incontestable, § 33(b) provides that "the registration shall be conclusive evidence of the registrant's exclusive right to use the registered mark." 15 U. S. C. § 1115(b). Read in isolation, this provision surely does lend support to the Court's holding. Indeed, an isolated and literal reading of this language would seem to foreclose any nonstatutory defense to an action to enjoin the infringement of an incontestable mark. The Court, however, wisely refuses to adopt any such rigid interpretation of § 33(b).[22]

---

[22] The Court emphasizes that it does not address whether traditional equitable defenses are available in an action to enforce an incontestable mark. *Ante*, at 203, n. 7. Thus, the Court chooses not to rule on whether the language of § 33(b) can be ignored when a defense such as laches or estoppel is asserted. Several courts have indicated that such defenses are allowed. See, *e. g.*, *Prudential Ins. Co.* v. *Gibraltar Financial Corp.*, 694 F. 2d 1150, 1153 (CA9 1982), cert. denied, 463 U. S. 1208 (1983); *Cuban Cigar Brands N. V.* v. *Upmann International, Inc.*, 457 F. Supp. 1090, 1092, n. 5 (SDNY 1978), aff'd without opinion, 607 F. 2d 995 (CA2 1979); *Carl Zeiss Stiftung* v. *V. E. B. Carl Zeiss, Jena*, 298 F. Supp. 1309 (SDNY 1969), modified, 433 F. 2d 686 (CA2 1970), cert. denied, 403 U. S. 905 (1971); *Haviland & Co.* v. *Johann Haviland China Corp.*, 269

An examination of other provisions of the Act plainly demonstrates that no right to injunctive relief against infringement automatically follows from the achievement of incontestable status. Thus, § 34 states that courts with proper jurisdiction "shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable." 15 U. S. C. § 1116. If a registrant establishes the violation of any right, § 35 additionally emphasizes that any recovery shall be "subject to the principles of equity." 15 U. S. C. § 1117. These sections are in addition to the broad power that § 37 grants to courts in "any action involving a registered mark" to "determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action." 15 U. S. C. § 1119. Moreover, it is well established that injunctions do not issue as a matter of course,[23] and that "the essence of equity jurisdiction has been the power of the Chancellor to do equity,"[24] particularly when an important public interest is involved.[25]

---

F. Supp. 928, 955 (SDNY 1967). Several commentators have also written on the subject. 2 J. McCarthy, Trademarks and Unfair Competition 761 (1984). One early article noted:

"The fact that Section 33(b) limits the defenses against an incontestable mark to seven specific issues is possibly not conclusive. It is difficult to imagine an equity court granting injunctive relief to a registrant who comes into court with unclean hands, even though the defendant is unable to estabish one of the seven specific defenses listed in Section 33(b). Other equitable doctrines such as laches and estopppel would probably also preclude injunction and damages in the case of an incontestable mark. However, there is always the possibility that the courts might give the Act a strict and technical construction, precluding any defense except those specifically enumerated." Diggins, The Lanham Trade-Mark Act, 35 Geo. L. J. 147, 195 (1947).

[23] *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305, 311 (1982).

[24] *Hecht Co.* v. *Bowles*, 321 U. S. 321, 329 (1944).

[25] *Porter* v. *Warner Holding Co.*, 328 U. S. 395, 400 (1946); *Morton Salt Co.* v. *G. S. Suppiger Co.*, 314 U. S. 488, 492 (1942) ("[C]ourts of equity may appropriately withhold their aid where the plaintiff is using the right

In exercising its broad power to do equity, the federal courts certainly can take into account the tension between the apparent meaning of § 33(b) and the plain command in §§ 2(e), (f) of the Act prohibiting the registration of a merely descriptive mark without any proof of secondary meaning. Because it would be "demonstrably at odds with the intent of [Congress]"[26] to grant incontestable status to a mark that was not eligible for registration in the first place, the Court is surely authorized to require compliance with § 2(f) before granting relief on the basis of § 33(b).[27]

*The Legislative History*

The language of §§ 2(e), (f) expressly demonstrates Congress' concern over granting monopoly privileges in merely descriptive marks. However, its failure to include mere descriptiveness in its laundry list of grounds on which incontestability could be challenged is interpreted by the Court today as evidence of congressional approval of incontestable status for all merely descriptive marks.

This history is unpersuasive because it is perfectly clear that the failure to include mere descriptiveness among the grounds for challenging incontestability was based on the understanding that such a mark would not be registered without a showing of secondary meaning. See *supra,* at 210–211. To read Congress' failure as equivalent to an endorsement of incontestable status for merely descriptive

---

asserted contrary to the public interest"); *Virginian R. Co.* v. *Railway Employees,* 300 U. S. 515, 552 (1937).

[26] *Griffin* v. *Oceanic Contractors, Inc.,* 458 U. S. 564, 571 (1982); see also *Garcia* v. *United States, ante,* at 80 (STEVENS, J., dissenting).

[27] *Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta,* 458 U. S. 141, 163 (1982) (all parts of a statute should be given effect if possible); *American Textile Manufacturers Institute, Inc.* v. *Donovan,* 452 U. S. 490, 513 (1981) (same); *Reiter* v. *Sonotone Corp.,* 442 U. S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word that Congress used").

marks without secondary meaning can only be described as perverse.

## The Practical Argument

The Court suggests that my reading of the Act "effectively emasculates § 33(b) under the circumstances of this case." *Ante*, at 197. But my reading would simply require the owner of a merely descriptive mark to prove secondary meaning before obtaining any benefit from incontestability. If a mark is in fact "distinctive of the applicant's goods in commerce" as § 2(f) requires, that burden should not be onerous. If the mark does not have any such secondary meaning, the burden of course could not be met. But if that be the case, the purposes of the Act are served, not frustrated, by requiring adherence to the statutory procedure mandated by Congress.[28]

---

[28] Moreover, even if the owner of a registered mark may not enjoin infringement, it is not true that the registration has become "meaningless." See *ante*, at 196. A registration may be used to prevent the importation of goods bearing infringing marks into this country. See 15 U. S. C. § 1124, 19 U. S. C. § 1526, and 19 U. S. C. § 1337(a). Additionally, registration in this country is a prerequisite to registration in some foreign countries. A. Seidel, What the General Practitioner Should Know About Trademarks and Copyrights 26 (4th ed. 1979); E. Vandenburgh, Trademark Law and Procedure 58 (2d ed. 1968). Further, the United States Court of Customs and Patent Appeals, in an opinion recognizing that Congress had expressed its desire that scandalous matter not be registered, wrote the following regarding the benefits of registration:

"Once a registration is granted, the responsibilities of the government with respect to a mark are not ended. The benefits of registration, in part with government assistance, include public notice of the mark in an official government publication and in official records which are distributed throughout the world, maintenance of permanent public records concerning the mark, availability of Customs Service for blocking importation of infringing goods, access to federal courts where there is a presumption of validity of the registration . . . , notices to the registrant concerning maintenance of the registration, and, to some extent, direct government protection of the mark in that the PTO searches its records and refuses registration

In sum, if petitioner had complied with §2(f) at the time of its initial registration, or if it had been able to prove secondary meaning in this case, I would agree with the Court's disposition. I cannot, however, subscribe to its conclusion that the holder of a mark which was registered in violation of an unambiguous statutory command "may rely on incontestability to enjoin infringement." *Ante*, at 205; see also *ante*, at 196. Accordingly, I respectfully dissent.

---

to others of conflicting marks. Apart from nominal fees, these costs are underwritten by public funds." *In re Robert L. McGinley*, 660 F. 2d 481, 486 (1981).