**BARNES GROUP INC., Plaintiff,**

v.

**CONNELL LIMITED PARTNERSHIP, Defendant.**

**Civ. A. No. 89–531–CMW.**

United States District Court, D. Delaware.

June 30, 1992.

James L. Holzman, Wayne J. Carey and Joseph Grey of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del. (Barry D. Rein, Robert M. Kunstadt and Jonathan E. Moskin of Pennie & Edmonds, New York City, of counsel), for plaintiff.

Arthur G. Connolly, Jr. of Connolly, Bove, Lodge & Hutz, Wilmington, Del. (James A. Drobile, Bonnie MacDougal Kistler and Paul G. Gagne of Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., of counsel), for defendant.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

The Complaint in this action, filed on September 27, 1989, by Barnes Group Inc. ("Barnes"), is for infringement of federally-registered trademarks under the Trademark Act of 1946 (the "Lanham Act"), 15 U.S.C. § 1051 *et seq.*, for use of false designations of origin and false descriptions and representations under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and for unfair competition, trademark infringement, deceptive trade practices and acts, misappropriation, unjust enrichment and dilution under state and common law. Plaintiff filed an Amended Complaint on October 27, 1989, adding counts for false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[1] and seeking to cancel certain federally-registered trademarks owned by defendant on grounds of likelihood of confusion and abandonment under Sections 14 and 37 of the Lanham Act, 15 U.S.C. §§ 1064 and 1119.

Connell Limited Partnership ("Connell") served its Answer and Counterclaim on November 13, 1989, denying the material allegations of the Amended Complaint and seeking a declaration of non-infringement, cancellation of plaintiff's trademark registrations for genericism pursuant to 15 U.S.C. § 1064 and a finding of monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2.[2] On December 15, 1989, Barnes served and filed its Reply to Counterclaim, denying the material allegations of Connell's counterclaim.

This Court has jurisdiction under Section 39 of the United States Trademark Act of 1946, 15 U.S.C. § 1121, under 28 U.S.C. §§ 1331 and 1338(a) and under principles of pendent jurisdiction. Jurisdiction and venue are admitted by both parties. Plaintiff's motion for a preliminary injunction was denied in an Opinion and Order entered on March 7, 1990.[3] A seven day trial was held in this case from October 7, 1991 through October 16, 1991. On December 6, 1991 the parties each submitted proposed findings of facts and conclusions of law.[4] This

---

1. On April 30, 1991, the Court entered a stipulated order dismissing plaintiff's claim for false advertising under Section 43(a) of the Lanham Act.

2. On February 12, 1991, Connell moved for leave to amend its answer and counterclaim to add a counterclaim for false advertising. The stipulated order entered by the Court on April 30, 1991, withdrew Connell's motion.

3. *Barnes Group, Inc. v. Connell Limited Partnership,* 15 U.S.P.Q.2d 1100, 1990 WL 25049 (D.Del. 1990).

4. The Court received a letter from plaintiff's local counsel on January 2, 1991 which discussed Barnes' concerns with certain conclusions made by Connell in its post-trial submission of findings of facts and conclusions of law. On January 3, 1992 the Court received a letter from defendant's local counsel which stated Connell's objection to plaintiff's January 2, 1992 submission on the grounds that it was improper since the Court had ordered at the conclusion of the trial that there were to be no reply briefs unless requested by the Court. In a letter to the parties, dated January 6, 1992, the Court authorized the defendant Connell to file a brief addressing those points raised in plaintiff's letter of January 2, 1992 and any misstatements of the record or of case citations it perceived in the plaintiff's proposed findings of facts and conclusions of law. Further, the Court authorized the plaintiff Barnes to respond to this brief in a reply brief.

Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

### A. *Background*

#### 1. The Parties

Plaintiff Barnes is a corporation organized and existing under the laws of the State of Delaware having its principal place of business in Bristol, Connecticut. Plaintiff, by and through its unincorporated division, Associated Spring Corry, manufactures a wide variety of precision metal parts and springs which include helical compression springs used as die springs. The die springs are marketed by and through plaintiff's unincorporated division, Associated Spring Raymond ("Raymond"). Consolidated Pretrial Order, Section III. Statement of Facts Requiring No Proof ("Stip.") 1. Raymond's business activities predominantly involve sales, marketing and distribution. (Transcript ("Tr.") 16).

Defendant Connell is a limited partnership organized and existing under the laws of the State of Delaware, having its principal place of business in Boston, Massachusetts. Connell manufactures a wide variety of die components, including helical compression springs used as die springs, all of which are marketed by and through its unincorporated division, Danly Die Set ("Danly"). (Stip. 2).

#### 2. Raymond's Die Springs

Raymond sells approximately 390 different die springs in four duty ranges. (Tr. 33). Raymond sells and has sold for many years die springs painted in four solid colors to denote the four duty ranges. Raymond uses the color blue to denote the medium load class and the color red to denote the medium heavy load class and the color gold to denote the heavy load class and the color green to denote the extra heavy load class.[5] (Stip. 3; PX5, PX6, PX7, PX8).

#### 3. Danly's Die Springs

Danly for many years has used and still uses a system of solid colors applied to the surface of its die springs to indicate load range. The color brown or copper is used by Danly to denote the medium load range. (PX 50). The color blue is used by Danly to denote the medium heavy load range. (PX 51). The color red is used by Danly to denote the heavy load range while the color yellow is used to denote the extra heavy load range. (Stip. 9; PX52, PX53).

In 1989 Danly commenced the use of, and now uses on a line of die springs marketed under the name of IDENTI spring, a color scheme to denote load range. Pursuant to this color scheme a brown spring with a blue stripe indicates the medium load range and a blue spring with a red stripe denotes the medium heavy load range and a red spring with a gold stripe denotes the heavy load range and a yellow spring with a green stripe denotes the extra heavy load range. On the IDENTI spring, both the color of the stripe and background color serve as load designators, although for two different systems, Raymond's and Danly's. The stripes are in the colors used by Raymond on its solid colored springs and the background colors are those used by Danly on its solid colored springs. (Stips. 10, 35).

#### 4. Nature of this Action

Raymond commenced this action in response to Danly's announcement, in August, 1989, of the launch of its IDENTI

---

5. Raymond is the owner of U.S. Trademark Registration No. 1,056,331, issued January 11, 1977. The goods on which the mark is used are described as "helical compression springs used as die springs operating in the medium duty range." Raymond is the owner of U.S. Trademark Registration No. 967,350, issued September 4, 1973. The goods on which the mark is used are described as "helical compression springs used in die springs operating in the medium-heavy duty range." Raymond is the owner of U.S. Trademark Registration No. 967,351, issued September 4, 1973. The goods on which the mark is used are described as "helical compression springs used as die springs operating in the heavy duty range." Raymond is the owner of U.S. Trademark Registration No. 967,352, issued September 4, 1973. The goods on which the mark is used are described as "helical compression springs used as die springs operating in the extra-heavy duty range." (Stips. 4–7).

spring die springs. (Plaintiff's Proposed Findings of Fact and Conclusions of Law ("PFFCL") at 6). Raymond claims that the sale and distribution of the IDENTI spring line will cause confusion in the workplace and dilution of its trademarks. Danly denies that there is any likelihood of confusion as to source between its IDENTI springs and Raymond's die springs. Danly asserts that Raymond's colors have become the generic indicators of load class in the market of die springs and serve as functional indicators of load class. With respect to plaintiff's claim of dilution, defendant asserts that Raymond's colors do not qualify for such protection. Danly claims that Raymond's litigation practices are aimed at protecting its monopoly power in violation of the antitrust laws. (Tr. 4–12).

## B. *Die Springs*

Die springs are used in the metal-forming industry to regulate the movement of a die in a press. (Stip. 14; Tr. 33). Die springs are available in different load ranges. Both parties offer die springs in four different load classes, *i.e.*, medium, medium heavy, heavy and extra heavy.[6] The load class of the spring determines how much pressure is applied in operation. The pressure applied against the raw material increases as the load class of the spring becomes higher. The higher the load class the heavier the spring. (Tr. 254). Selection of the wrong load range die spring for any given use can result in improperly formed parts, broken die springs, injury to workers, damage to dies and costly production "down time" to correct such errors. (Stip. 21; Tr. 265).

Die springs are manufactured in a variety of length specifications which differ by as little as a quarter of an inch from one size to another size. (Tr. 292). The dimensions of the outside diameter of a die

---

6. No industry standard exists in the United States for die springs (metric or otherwise) as there is in Japan for regulating the use of colors on *metric* die springs. A proposed standard for Europe (that has not yet been adopted) utilizes the Danly colors for three of the four load ranges. (Stip. 57).

spring also vary in size by increments of a quarter of an inch. (Tr. 293).

### 1. Die Spring Users

Die springs are purchased by end-users referred to as stampers and by tool and die shops, which design dies for use by the stampers. Die springs are also purchased by distributors and sub-distributors for sale to tool and die shops and stampers. (Stip. 15). The stamping companies which make the product, use die springs. Traditional tool and die shops which do not manufacture a product but design and make the dies and the tools that are sold to the stampers, use die springs. The two markets for die springs are the tool and die shops and the stamping industry. (Tr. 27–28). The general practice in the metal forming industry is (and has been for many years) that end-users do not purchase both Raymond and Danly springs. (Stip. 18).

### a. *The Stamping Industry*

Stampers [7] take raw material, the raw metal, and shape and form it into the desired metal products ranging from car bodies to small consumer items. Large presses are used to stamp the raw metal into the desired form. The die determines the form of the product. A die set consists of two pieces of metal, a bottom and a top part. In between the bottom and top is the tooling which actually controls the shape of the product. The die is placed within a bed inside the press. The press applies the pressure to stamp out the product.[8] The die springs apply the load and the pressure and relieve the load and pressure on a consistent basis. The die springs are contained either within the die set or outside the die set depending on the design of the die. The die springs represent a small expense in comparison to the die sets which can cost thousands of dollars. The die sets are manufactured by a tool and die shop or a stamping company that has its own tool-

---

7. The stamping industry can also be referred to as metal forming companies and press companies. (Tr. 37).

8. Charles Brown an expert in tool engineering made a drawing of a press on PX259.

ing department. (Tr. 28–32, ·266–67, 632–34; DX218).

Stampers procure die springs to replace the die springs in their die sets on a periodic basis in order to maintain the die sets. After so many cycles the press will tend to lose load and at that point the stampers replace the die springs. Most companies have established preventive maintenance programs which require the replacement of die springs and other machine components in a. die set on a scheduled basis in an effort to avoid a break down. (Tr. 31–32).[9]

### b. The Tool and Die Shops

The tool and die shops are the facilities that design and make the dies. Some stampers have their own tool and die shops but many do not or their capabilities are limited such that they contract this type of work out to the tool and die shops. Sometimes a tool and die shop will just build a die relying on a blueprint of a die that has already been designed. The tool and die shops sell the die to the stampers. The dies can be sold with or without the die springs but usually the tool and die shop will recommend the die springs to be used in the die especially if the tool and die shop has designed the die. The level of education or training of the person within the tool and die shop that deals with die springs can vary but the individuals that design the dies are technically oriented and may have engineering degrees and the tool and die persons are also highly skilled and trained. (Tr. 41–42).

### 2. Die Spring Replacement

Die springs need to be replaced in a die when they break or when a preventive maintenance program requires a change. The procedure generally followed for replacing springs is to remove the die from the press, place it on a die cart, wheel it into the toolroom and place it on a work table in a well-lighted area. (Tr. 576, 677, 737, 1059). Since the dies tend to be very expensive and there can be serious conse-

quences if a die spring with the wrong load class is put into an application, the job of replacing die springs is not given to an unskilled laborer. At General Electric for example only certified tool and diemakers are responsible for replacing springs in a die. At General Electric tool and diemakers are required to go through an apprenticeship tool and die maker program which includes classes in such subjects as engineering, physics, chemistry, metallurgy, shop theory and shop math along with a requisite number of shop hours. (Tr. 290–292).

The tool and diemaker is considered to possess the highest level of skill in the metal forming industry. They acquire their skill through experience and apprentice programs lasting from four to seven years. They are generally the highest paid craftsmen in the metal-forming industry. (Tr. 577–78). It is the diemakers responsibility to determine what needs to be done inside of a die in order to make a die operational and functional. When a die is down for maintenance it the diemaker's responsibility to replace any components that need to be replaced including the die springs. (Tr. 576).

### a. Storage of Die Springs

Tool and die shops generally do not maintain die springs in inventory; rather, they purchase springs on an as needed basis to install in dies that the tool and die shops make to the specifications of the end-user. (Stip. 16). End-users, the stampers, typically do maintain inventories of die springs which are found in bins which are found in tool room "cribs" which are accessible to the place in the factory where the stamping operations are carried out. (Stips. 17, 18).

The Raymond and Danly die springs are packaged in cartons or bags bearing their own names or logos. (Tr. 754–755; DX357, DX80). The die spring users typically remove the springs from the cartons and store them in drawers or bins, separated by

---

**9.** Leonard M. Carlucci is employed as the Director of Marketing, Sales and Distribution for the Associated Spring Group of Barnes. Mr. Carlucci's basis of knowledge as to the stamping industry is on-the-job experience from 22 years of being around a variety of factories and plants and shops. (Tr. 13, 30–31).

length and diameter within each of the color groups. (Tr. 291–292, 678). At General Electric the storage of die springs was separated by color and then by the different geometries of length and outside diameter within each color group. (Tr. 292). When the toolmaker selects a replacement spring from the tool crib to put in a die he must select a spring with the correct load class, length and outside diameter. A spring can not be picked out of the tool crib indiscriminately. Since the tool and die-maker must select the correct spring there is a lot of time spent sorting the die springs into the appropriate bins. The tool and die maker will not assume, however, that all of the springs have been correctly stored in the bins. (Tr. 292, 293, 303, 305).

The tool and diemaker selecting a spring can determine the load class of a spring visually by use of a color code which designates load class or by measuring the size of the wire using a measuring tool called a caliper. (Tr. 1069). If the color were worn off of a broken spring that was being replaced, for example in the case of users who dip their dies into a solution to degrease them which can cause removal of the paint, the toolmaker is still able to determine the load class of the spring by looking at the wire diameter or wire thickness. (Tr. 678). In addition, toolmakers carry pocket scales to enable them to check the measurement of the length and diameter of a spring which they routinely do to verify that the dimensions of the spring are correct. (Tr. 305, 678).

### b. Ordering Die Springs

A purchaser of die springs must be sure to purchase the proper die springs for a die to avoid the risk of damaging a expensive die with the wrong die spring. (Tr. 266–267, 633–34; DX218). The engineer gener-ally will determine the spring to be used in a tool. The ordering of die springs can be performed by a purchasing agent, a tooling engineer or a senior toolmaker. (Tr. 683, 736, 1059–1060).

Most stamping operations have their own maintenance departments. In a stamping operation die springs are ordered by the maintenance foreman who requisitions the needed product in terms of quantity, dimension, and load range based on springs in current use in the die that are being replaced. Load range is referred to by color. The requisition goes to the purchasing department where a purchase order is sent to the local industrial distributor. (Tr. 38).

Both parties publish die spring catalogs which list the sizes and performance specifications for each of their springs which are usually available in the user's purchasing department or engineering office. (Tr. 737; PX10, PX13, DX105). Some of the larger stamping houses have compiled preferred component lists which will dictate the supplier of die springs. The compilation of these lists requires a great deal of effort. (Tr. 294).

### 3. Die Spring Product Market

Die springs, a type of heavy-duty compression spring, fit into the tool and die segment of the heavy-duty compression device market.[10] Also belonging to this segment of the heavy-duty compression device market are gas springs such as nitrogen springs, rubber springs and polyurethane springs which are all used in the die market.[11] These products may be and are used interchangeably with die springs. Die springs are also used for non-die applications for purposes outside of the metal

---

10. Helical compression springs capable of being used as die springs are manufactured by numerous U.S. companies in addition to plaintiff and defendant, including the Peterson Spring Co. division of Peterson American Corp., the Lee Spring Co. division of Unimax Corp., Rockwell Spring, Baumbach Spring, Precision Spring and Hyde Spring. There are numerous foreign manufacturers as well, including C.I.M.A. Compagnie Italiano Molle Acciaio S.p.A., Bordignon Di Bordignon Silvano & C., S.n.c., Special Springs S.r.l., Tokyo Hatsujyo Manufacturing Co., Ltd., Misumi Shoji, Ltd., NHK, Muhr & Bender and Eibach. (Stip. 28).

11. Rubber springs are referred to as marshmallow springs. A gas spring is a metal product, like a hydraulics that is gas-loaded for the pressure. The nitrogen springs are also referred to as nitrogen cylinders. (Tr. 20).

forming industry.[12] (Stip. 22; Tr. 19–21, 263–64, 314–15).

### a. Raymond's Market

Raymond makes die springs for non-die usage. However, a majority, 90 to 95 percent of the market for Raymond's die springs, is for die applications. (Tr. 27). Raymond does not make polyurethane or marshmallow springs. Raymond does market the nitrogen cylinder but it purchases it from another company. Some of Raymond's major master distributors carry marshmallow and polyurethane springs and nitrogen cylinders. The Raymond distributors carry these substitute products in order to provide the customer with an alternative. Though it is done, it is not common that the buyers of these products would buy more than one kind of these products for their shops. (Tr. 19–22).

The geographic marketplace for die springs can be viewed as being divided into the three areas of North America, Europe and Asia. Raymond's primary market for its sales of die springs is North America but it also sells its springs in Europe and Asia.[13] (Tr. 22). In terms of dollars the North American market which includes the United States and Canada is $25 million for die springs.[14] In Mr. Carlucci's opinion Raymond has 55 percent of this market while Danly has 25 to 30 percent.[15] Mr.

Carlucci explained that it is difficult to obtain exact information concerning the die spring market as there is no organization or source which publishes authoritative information on the size of the North American die spring market and the market shares within it.[16] The numbers available from the Die Set Bureau are not an accurate representation of the market. These numbers reflect only sales of the reporting members of the Die Set Bureau and it must be assumed that the information is being reported accurately. Also it is a difficult market to quantitate since it is a maintenance and repair market. (Tr. 42–44, 783–790). Viewing the entire world market for die springs it was Mr. Carlucci's opinion that as between Europe and North America the shares for Danly and Raymond are 50/50. (Tr. 44–45).

### 1. Raymond's Promotional Activities

Raymond attempts to increase its market share by adding value to its die spring product. Raymond does this by insuring that its master distributors maintain large inventories worth from 1.5 million to 2 million dollars. In addition, Raymond itself maintains over 3 million dollars worth of finished goods inventory, die springs, in its three or four stocking facilities around the country. These efforts are aimed at providing Raymond customers with prompt

---

**12.** Die springs can be used in the hydraulic industry of water companies or oil companies where a high pressure device is needed to operate large shutoff valves. Dental and medical equipment requiring a major counterbalance spring can use a die spring or a heavy-duty compression spring. (Tr. 20–21).

**13.** Both Raymond and Danly sell their springs internationally, and there is increasing competition for sales of die springs in the United States from foreign manufacturers. (Stip. 30).

**14.** The overall U.S. market for precision springs is approximately $1.5 billion annually. Approximately 40% of the precision springs manufactured for sale in the U.S. and Canada are compression springs. (Stip. 29).

**15.** Mr. Carlucci's information is derived from actual experience, the numbers the Die Set Bureau distributes and from monitoring the activities of the stamping companies. He admitted that a definition of this market is not based on a precise formula. (Tr. 43).

**16.** At trial Mr. Lowum who has been President of Danly since January 1, 1988 and employed with Danly for forty years estimated Raymond's share of the die spring market to be 70 to 75 percent. This estimate was based on inferences and assumptions to compensate for the lack of authoritative figures for the total U.S. sales of die springs and the fact that Raymond sells through master distributors rather then through direct sales as does Danly. Mr. Lowum also based this estimate on his theory that any assessment of Raymond's market share needs to based on market dollars and his belief that Raymond allows a discount of 48 to 52 percent from the list price of its product to its master distributors. However, there was no expert testimony to verify Mr. Lowum's assumptions and beliefs. Furthermore, insufficient evidence was offered by Danly to establish how the die spring market was to be defined either product wise or geographically. (Tr. 717, 783–790).

service and delivery of its die spring product. (Tr. 45–46).

Raymond puts money into promotion and advertising and customer service. Raymond has its own sales force to provide technical assistance to the sales forces of its master distributors such that customers are provided with technical expertise for solving application problems. Raymond spends approximately $200,000 a year for advertising and promotion. (PX 104–B). In addition, Raymond spends approximately $50,000 to $100,000 a year on catalogues, spring handbooks, literature and trade show appearances. Raymond also maintains a staff of approximately 25 to 30 people as internal customer service people. It was Mr. Carlucci's understanding that of the estimated 10,000 to 15,000 stamping companies and 8,000 to 10,000 tool and die shops in North America that 60 to 70 percent are contacted by someone from Raymond or one of its master distributors or subdistributors with respect to die springs. (Tr. 45–53).

## 2. Raymond's Marketing and Distribution System

Raymond markets its springs through master distributors.[17] The master distributors are privately held companies or partnerships or corporations which distribute nationally and in some cases internationally. They have their own warehouses, inventories, sales forces and set of sub-distributors. They supply Raymond's product, along with numerous other products that they manufacture themselves or purchase from others, to regional distributors. Among the products that the master distributors manufacture and distribute are wear plates, pipes and bushings all of which are die components that are utilized in the tool and die industry. Some of the master distributors manufacture die sets. It was Mr. Carlucci's testimony that none of the distributors manufacture die springs. (Tr. 22–26). The distribution of die sets and/or other die components by

Raymond's master distributors aids in the marketing of Raymond's die springs. (Stip. 25). The average master distributor does $10 to $20 million in sales. (Tr. 24).

In the region of North America, which includes Canada and the United States, there are ten master distributors that carry the Raymond spring. However, there could be hundreds of other companies that would consider themselves master distributors. Some of the master distributors sell both in Canada and the United States. Users of Raymond's die springs tend to stay with the same distributor and buy from a distributor within their own country though the user is given a choice as to both. (Tr. 23–25).

Raymond has had its distribution system of master distributors and sub-distributors for approximately 35 to 40 years. Raymond developed this system for the advantage it provides in reaching the customer in the local and regional markets. This system allows Raymond to rely on the sales forces, the warehousing and inventories of the distributors who can provide a customer with die springs and an overall local source of a wide range of products for use in the tool and die industry. (Tr. 25–27, 45–46, 70–71, 312–13). It was Mr. Carlucci's opinion that a majority of Raymond's distributors' sales of die springs are to the stampers because they are consuming and repeat buying die springs in order to maintain their equipment. However, he also indicated that the sales to tool and die shops are also significant. (Tr. 37). The tool and die shops and the stampers are serviced substantially the same way through Raymond's distribution system. (Tr. 28).

Each of Raymond's master distributors is authorized by Raymond to use Raymond's trademarked colors. (Stip. 24). Raymond has written agreements with its master distributors by which they are permitted to use the Raymond name and the

17. Raymond's ten master distributors are Producto Machine Company, Lamina, Inc., Die Supply Corp. (Dieco), Superior Die Set Corp., Anchor Die Supply, Inc., Lempco Industries, Inc., D–M–E Company, Engineered Models, Corp., Marathon Spring Division of SMS Corp. and Standard Die Supply of Ind., Inc. (Stip. 24). Shortly before trial one master distributor, Anchor Die Supply, Inc. was purchased by another, Lamina, Inc. (PFFCL at p. 8, n. 4).

trademarks at issue. (Tr. 53, 123; PX23–PX32). Raymond's master distributors consistently advertise and promote the springs as being made by Raymond and thus are able to benefit from Raymond's reputation. (Tr. 317, 318–19, 346; PX39–PX45).

### b. *Danly's Market and Distribution System*

In addition to manufacturing and selling die springs, Danly manufactures and sells die sets and diemaker supplies. (Tr. 725–26). Danly's customers for these products are tool customers in the tool and die trade and the end-user group, the stampers. Danly does not market dies due to its policy of avoiding competition with its diemaker customers. (Tr. 726, 727).

Mr. Lowum testified for Danly concerning Danly's share of the market for die sets and Danly's system of distribution of its products. It was Mr. Lowum's testimony that Danly holds approximately 38% of the reported market for sales of die sets, with the balance held by five die set manufacturers which are also master distributors of Raymond die springs. (Tr. 727–729). Danly is the largest U.S. distributor of die sets and die components and Danly's marketing of its die springs is aided by its marketing and sale of die sets. (Stip. 26). Danly markets its die springs through a network of ten company-owned branch locations and 70 independent distributors and approximately 30 direct salespeople. (Tr. 726, 740). Danly's die springs are sold directly by Danly. (Stip. 27).

### 4. Die Spring Wire Configuration

The wire used to make Raymond die springs is a flattened wire, which, when coiled, results in a trapezoidal cross-section, with a narrow edge at the outside diameter of the spring and a wider edge at the inside diameter, giving the spring wire a rounded appearance. (Tr. 100, 121, 748).

The wire used to make Danly die springs is drawn through a die to a keystone shape, which, when coiled, changes to a "D"-shaped configuration, with rounded corners on the inside diameter and a smaller radius on the outside diameter, giving the spring wire a more square appearance. (Tr. 275, 746–747).

Tool and diemakers can distinguish between Raymond and Danly springs by looking at the wire shape, without regard to the color of the springs. (Tr. 1068–1069). In their advertising both parties note the difference in wire shape between their springs and promote their respective shapes as being superior. (Tr. 124–125; PX33; DX122; DX126; DX128; DX129; DX320).

### C. *Raymond's Marks*

Raymond registered its system of four colors with the U.S. Trademark Office. Raymond's trademark registrations are incontestable pursuant to Section 15 of the Trademark Act of 1946, 15 U.S.C. § 1065. (Stip. 8) [18]. Raymond's use of the colors blue, red, gold and green are arbitrary as applied to die springs. At trial Dr. Jacoby, Raymond's expert witness in psychology, marketing and consumer behavior demonstrated how colors were arbitrarily selected to indicate load range in the Raymond system. He explained that a more effective means of indicating load range from the lowest level along the continuum to the highest level would be with use of an ordinal-based system i.e. the use of an increasing number of stripes or marks on the springs as the load-bearing capacity would increase. (Tr. 459–463).

### 1. Use of Marks

Raymond has used its four color system for identifying the four duty ranges of die springs since at least as early as 1963. The colors RED and GOLD were adopted by Raymond at least as early as 1953 and the color GREEN as early as 1963. The

---

**18.** This provision provides in pertinent part: "the right of the registrant to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable...."
15 U.S.C. § 1065.

color BLUE was adopted by Raymond no later than 1959. (PX3, PX4, PX9). Raymond's trademarks are referred to as the "Raymond colors" in the industry. The Raymond system of colors for designating load class is the best known system among U.S. purchasers and users.

### 2. Protection of Marks

Raymond has written agreements with its master distributors which state that if a distributor should leave Raymond they are not to use the Raymond color code or buy die springs from another company and paint them with the Raymond colors. The distributors are also not allowed to have two sources of die springs and paint them with the same colors while doing business with Raymond. (Tr. 53–55; PX23).

Raymond actively defends and protects its trademarks against uses it perceives to be potentially infringing because it fears the loss of its trademark rights and dilution of its marks. Raymond has in recent years protested the conduct of and pursued legal action against third parties who have attempted to use the Raymond system of colors on their springs. (Stips. 49–56, 58, 59; Tr. 61–66). There is no evidence to suggest that Raymond's actions are fueled by improper motives.

In 1975, Raymond's master distributor, Lempco Industries, Inc., began marketing springs produced by Rockwell International Corp. bearing all four of Raymond's colors on duty ranges corresponding to those for which Raymond uses its colors. In 1975, Raymond commenced an action for trademark infringement in the United States District Court for the Northern District of Ohio, entitled (as amended in 1976) *Barnes Group Inc. v. Lempco Industries, Inc. and Rockwell International Corp.*, Civil Action No. C–75–512. As a result of a settlement agreement dated October 1, 1976, defendants in that action agreed to cease all unauthorized use of Raymond's marks. (Stip. 49).

In about mid–1987 (according to Raymond) or mid–1985 (according to Danly), Cima Compagnie Italiano Molle Acciaio S.p.A. ("Cima") began selling in the U.S. white springs bearing two stripes (180 degrees apart) of the Raymond colors for each of the four corresponding duty ranges. The Cima springs were distributed in the U.S. by Dayton Progress Corp. and J & S International. Dayton Progress now sells springs manufactured by Peterson American Corp. (Stip. 50). In Canada, where Cima springs are still distributed, Raymond commenced an action on January 23, 1990 against Cima and its Canadian distributor entitled *Barnes Group Inc. v. J & S Precision Ltd. and C.I.M.A. Compagnie Italiano Molle Acciaio S.p.A.*, Court File No. T–164–90. (Stip. 51).

In November, 1987, Unimax Corp., by and through its Lee Spring Company division, began manufacturing and selling in the U.S. die springs bearing three of Raymond's colors (BLUE, RED, and GREEN) on duty ranges corresponding to the duty ranges on which Raymond uses these colors. On April 7, 1989, Raymond commenced an action in this Court entitled *Barnes Group Inc. v. Unimax Corp.*, Civil Action No. 89–166 (CMW), and on July 25, 1989, Unimax and Raymond entered a settlement agreement pursuant to which, effective November 15, 1989, Unimax and its Lee Spring Company division ("Lee") ceased using the three Raymond colors. Also pursuant to the settlement agreement Unimax and Lee adopted a new color scheme in which the color gray denotes the medium load range and the color purple denotes the medium heavy load range and the color black denotes the heavy load range and the color orange denotes the extra heavy load range. (Stip. 52).

In about March, 1989, one of Raymond's Canadian distributors, Producto Diemakers Supplies, Ltd. ("Producto"), began marketing springs produced by Bordignon Di Bordignon Silvano & C, S.n.c. ("Bordignon"), bearing all four of Raymond's colors on the corresponding duty ranges. On August 30, 1989, Raymond commenced an action entitled *Barnes Group Inc. v. Producto Diemakers Supplies, Ltd. and Bordignon Di Bordignon Silvano and C., S.n.c.*, court file No. T–1809–89, in which the court preliminarily enjoined Producto from using the four Raymond colors on its die springs and

entered judgment by default against Bordignon. (Stip. 53).

In January, 1988, Special Springs, S.r.l. ("Special") began selling springs in the U.S. bearing Raymond's colors on each of the four corresponding duty ranges with a band of gray at one end of each spring. The Special springs were distributed in the U.S. by Tipco Punch, Inc. As a result of a settlement agreement reached in the Canadian lawsuit, *Barnes Group Inc. v. Special Springs, S.r.l. and Tipco, Inc.*, court file No. T–1810–89, Special agreed to stop selling springs bearing Raymond's colors in Canada and the U.S. There is also a U.S. lawsuit entitled *Barnes Group Inc. v. Special Springs S.r.l. and Tipco Punch, Inc.*, Civil Action No. C1–90–309 (S.C.Ohio). (Stip. 54).

### D. *Danly's IDENTI Springs*

#### 1. Introduction of Danly's IDENTI Springs

On August 28, 1989, Danly announced to its distributors the launch of its IDENTI spring product line. (Stip. 38). On September 5, 1989, Danly's President, David Lowum, received from outside counsel for Raymond, Barry D. Rein, Esq. of Pennie & Edmonds, a cease and desist letter dated September 1, 1989, protesting Danly's alleged infringement of Raymond's trademarks. (Stip. 41).

The IDENTI spring line of die springs retains Danly's own distinctive wire shape and its own traditional solid colors, but a stripe of color has been added corresponding to the Raymond color code to designate load class. (Tr. 848). Danly's IDENTI springs are made by taking solid-colored Danly springs from inventory and painting them with stripes. This method was selected because it permits Danly to maintain a single inventory of die springs (with an accompanying cost efficiency) and because it preserves the traditional Danly colors on the springs. This, Danly believes, will permit it to introduce its traditional solid col-

ors to users who purchase IDENTI springs and, once the users become familiar with the Danly system of colors, to convert them to use of solid-colored Danly springs. There is a planned further cost-saving to Danly from converting IDENTI spring users to solid-colored Danly springs since it eliminated the need (and cost) of painting springs sold to such users with stripes of Raymond's colors. (Stip. 33). The dominant feature in the appearance of Danly's IDENTI springs is their background color. (Stip. 34).

The manufacturing specifications for striping these springs require a stripe on each side of the spring, 180 degrees apart. The width of the stripe is required to be three-eighths of an inch wide, unless the diameter of the spring is 1¼ inches or less, in which case the stripe is to be only a quarter of an inch wide, so that it remains clear which is the stripe color and which is the background color. (Tr. 850; PX179).

Simultaneously with and as a part of the development of the IDENTI spring line, Danly redesigned the physical dimensions of 81 of its die springs to make them function more like Raymond's most nearly comparable part sizes. The redesign was intended to make the *entire* IDENTI spring line interchangeable with Raymond's springs and thus facilitate Danly's ability to compete for traditional Raymond customers. (Stip. 36). From the launch of the IDENTI spring product in December 1989 through October 1990, Danly sold $164,428 of the product in U.S. and Canada. Danly had projected first year IDENTI spring sales in the U.S. of $700,000. (Stip. 46).

#### 2. Danly's Intent

Danly's IDENTI springs are a new line of die springs developed by Danly as a result of Danly's desire to increase its sales on its die spring product line.[19] (Stip. 31). In 1988, Danly commissioned a market research firm, Marketing Corporation of America ("MCA"), to study the U.S. die components market and provide recommen-

---

19. A vast amount of trial time was spent reviewing and interpreting the July 22, 1988 opinion letter, PX127, for reasons unclear to the Court. PX127 represents what it represents which in the Court's view is Danly's attempt to avoid infringing Raymond's trademarks and violating Raymond's legal rights in its pursuit to increase its sales of die springs.

dations to Danly for means to increase sales and market share. (Stip. 31). Among a total of twenty strategies presented by MCA for increasing Danly's total sales, a recommendation made to Danly for expanding its die spring line was to "[d]irectly replace Raymond line with substitute product". MCA concluded that "[g]rowing share in die springs means taking it away from Associated Spring/Raymond, a Barnes Group, Inc. Division." (Stip. 32).

3. Alleged "Color Code Barrier"

Danly alleges that it is unable to compete with Raymond due to what it labels as the Raymond "color code barrier". Danly claims that this barrier is created by the preference of most Raymond die spring users to be standardized on Raymond as their only supplier of die springs. Danly explains that this preference is based on four factors which include reductions in costs and in storage space and in the risk of possible confusion between the parties blue and red springs and the users reluctance to learn a new color code for indicating load class. However, Danly admits that the cost factor is not directly related to the alleged color code barrier. Costs are reduced by buying from a single source through volume discounts. (Tr. 296, 803–4).

A review of Danly's market history reveals other reasons that could explain Danly's perceived inability to compete with Raymond. Prior to the adoption of the IDENTI spring Danly had a share of the market and from year to year had experienced increases and reductions. PX130, a strategic planning document for Danly Die Set, reflects that as of September 28, 1988, the date the document was written, that Danly had regained its market share from a low point it had reached in 1986 by achieving the market share it had possessed in 1981. Danly's loss of market share can be attributed to a nine month strike at Danly Machine, which Danly was a part of, in 1984–85. Further, a relocation from Chicago to Mayva, Wisconsin, in 1986 restricted Danly's growth.

Danly's market share also suffered in part because at one point in time Raymond had started using chromium vanadium wire which the automotive industry was convinced was the best possible wire for springs, and Danly was not using it. Danly was still using chrome silicon wire which was perceived as being of a lesser quality because of its being an inherently dirty steel that provided all kinds of nonmetallic inclusions and other things, which tended to raise stresses. The Raymond spring on the basis of quality at this point in time was the better spring and thus Raymond was able to gain market share. (Tr. 799–800, 916–918).

Danly's ability to compete for Raymond customers was also limited by the lack of interchangeability of Danly and Raymond springs. Until August, 1990, when it completed the redesign of its 81 round wire springs, Danly did not have a full line of die springs that had performance properties comparable to Raymond's. Many of Danly's springs in the medium, medium heavy and heavy load ranges, made of round wire, were not functionally interchangeable with Raymond's springs. (Stip. 37).

In addition, regardless of whether a color code barrier exists or does not exist if a companies' management made a decision to switch suppliers of its die springs such a change would be instituted. (Tr. 285–85). Furthermore, the fact that Danly's colors are well known among a substantial number of users of Danly springs allows the argument to be made that there exists a color code barrier which effects Raymond's ability to compete with Danly.

4. Danly's Efforts to Educate the Market

Danly publishes and distributes an "IDENTI" spring cross-reference list which explains the meaning of the stripe to purchasers and users. (Tr. 691, 857; DX 114). Danly has also placed a variety of advertisements and editorials in trade publications that explain the color coding system of the IDENTI spring. (Tr. 883–886; DX124, DX163, DX165, DX168, DX169). Danly's salespeople are instructed to in-

form customers about the use of the stripe as a load designator. (Tr. 886). Customers are told that the stripe is an easy cross-reference to the Raymond color code they are accustomed to, and that, for example, a red stripe on the IDENTI spring means it is equivalent to a red Raymond spring. (Tr. 692–693, 695).

Danly continues to recommend against intermixing IDENTI springs in the same die with competitive springs, just as it has traditionally done with its solid-colored springs. (Tr. 715, 858). Danly continues its practice of offering "swap-outs" or "stock-lifts" to IDENTI spring customers that have Raymond springs in their inventory.[20] (Tr. 1081–1082).

### 5. IDENTI Spring Use

Defendant presented the testimony of Wayne Freehalt, owner of Omni Manufacturing Company ("Omni") which is both a tool and die shop and a stamping company. (Tr. 1056). Upon finding that the Danly spring in the same tool lasted at least six times longer than the Raymond springs it had been standardized on and using, Omni decided to switch from the Raymond springs to the Danly springs. (Tr. 1060–1064).

Omni is now a purchaser of IDENTI springs and stores them in the same bins as its existing Raymond inventory. The Omni employees have not expressed any questions as to the manufacturer of the IDENTI spring or whether Raymond authorized Danly to use the stripe of color. (Tr. 1067–1068). None of the Omni employees has ever expressed any confusion as to the load class of the IDENTI spring. (Tr. 1068).

Mr. Freewalt further testified that an Omni employee presented with a spring from which the color has been stripped is able to determine by the wire shape whether it is a Danly die spring or a Raymond die spring. (Tr. 1068–1069). Using a caliper the Omni employees can also determine the load class of the die spring that has its color removed by measuring the wire thickness of the die spring. (Tr. 1069).

### E. Evidence as to a Likelihood of Confusion

#### 1. Market History with Solid Colors

Both parties have a solid color spring in a blue color. Neither party has objected to the other's use of the same or substantially similar blue color for the past 30 years. (Tr. 767–768). Both parties have a solid color spring in a red color. Neither party has objected to the other's use of the same or substantially similar red color for the past 25 years. (Tr. 777). Raymond's gold color is quite similar to the Danly copper used before 1979, and the Danly brown used since 1979. (Tr. 300, 779). Neither party has objected to the other's use of the similar gold/copper/brown colors for the past 38 years. (Tr. 779–780).[21] Despite the parties' simultaneous use of the same or similar colors on different load classes on three out of four of their die springs for 25 years or longer, there was no evidence that any confusion has ever resulted, either as to the source or sponsorship of either party's spring, or as to the correct load class of any spring.[22] (Harkless Dep. at 91–92).

#### 2. Actual Confusion

Plaintiff presented no evidence at trial of actual confusion among die spring users as to whether Danly was authorized or licensed by Raymond to use the colored stripes on its springs, i.e., sponsorship confusion or as to the correct load class of the IDENTI spring i.e., load confusion. Plaintiff instead called its expert witness on consumer psychology, Dr. Jacob Jacoby.

**20.** When customers decide to switch from Raymond to Danly (or vice versa) each of the parties has at various times purchased the customers' entire current inventory of competitive springs and replaced it with the party's own line of springs. The practice is sometimes referred to as "stock-lifting". (Stip. 19).

**21.** Each of the parties has made use of "color comparison charts" in which the two parties' color systems are arrayed in juxtaposition to one another. (Stip. 20).

**22.** The Court views the evidence of confusion discussed in Section V. at page 5 of the letter to this Court from Mr. Carey, local counsel for the plaintiff, dated January 2, 1992, to be insignificant.

Dr. Jacoby testified at trial that the likelihood of confusion among purchasers and prospective purchasers of die springs is *de minimis* because the purchaser who is purchasing the die springs, most likely purchases the die springs with catalogs, which are clearly identifying the manufacturer. (Tr. 484).

Plaintiff's proof of any likelihood of confusion both as to sponsorship confusion and load confusion was limited to the opinions of Dr. Jacoby. Dr. Jacoby's opinions were not based on any survey evidence and he admitted that he had requested that plaintiff conduct a survey which plaintiff declined to do. (Tr. 556). Dr. Jacoby was able to form his opinions regarding the likelihood of confusion without ever having actually seen or handled an IDENTI spring. Dr. Jacoby has never observed tool and die makers at work or replacing a spring in a tool and die shop nor has he observed a stamping shop. He has not observed such users stock inventory with replacement die springs. Dr. Jacoby has not done any market research to gauge how tool and diemakers would do these tasks. (Tr. 467–468). Dr. Jacoby admitted that his opinions were limited by the lack of empirical data. For example it was his opinion that errors in load identification would occur but he admitted that the rate, frequency and duration are empirical questions. (Tr. 416).

### 3. Evidence of Psychological Studies

Raymond asserts that unacceptable confusion levels are inevitable in the present case because accepted psychological studies confirm such a result. Dr. Jacoby testified about such studies to support his opinions that workers familiar with the Raymond system will tend to focus on the background color of the IDENTI springs and overlook the stripe of color when selecting a spring and thus select the wrong load class spring. He stated that this would occur with the solid colored blue IDENTI spring with a red stripe and likewise with the predominantly red IDENTI spring and to a lesser degree with the brown IDENTI spring. Dr. Jacoby believed that because he considered the coloration of the IDENTI springs to be ambiguous that when workers familiar with the Raymond system perceive the IDENTI spring, they will interpret its ambiguous color pattern as their prior experience dictates and select the wrong load class spring once again by focusing on the background color.

In the Court's view, however, the studies relied upon by Dr. Jacoby are not persuasive evidence of the likelihood of confusion. Other facts in this case show the correlations drawn by Dr. Jacoby between the findings of these various studies and the die spring workplace and worker to be very weak. The fact that users of die springs use great care in selecting a spring to place in a die makes it unlikely that the stripe of the IDENTI spring will be overlooked. Also, the Court does not characterize the coloration of the IDENTI springs as being ambiguous due in large part to the efforts by Danly to educate the industry in the use of the IDENTI spring. Raymond belittles Danly's efforts but the Court having reviewed Danly's advertisements finds them to be helpful.

### F. *Evidence as to a Likelihood of Dilution*

Raymond asserts that psychological and marketing knowledge establishes that dilution is inevitable in the present case. Raymond relied heavily on the field of cognitive psychology to support its claim of dilution. Dr. Jacoby explained that as the association set, (the number of ideas associated with (and stimulating) a given symbol), increases, the recognition and recall of trademarks and other symbols diminishes. He stated that in his opinion the result of Danly's use of Raymond's trademark colors is an increase in the number of associations for those colors which interferes with the recognition and recall of those colors as Raymond's trademarks. Dr. Jacoby further stated that it is this interference which will cause the exclusive association of the color trademarks with Raymond to be weakened to the point of becoming industry standards for designating load classifications.

Dr. Jacoby demonstrated these principles upon which he relied through a variety of demonstrations. The Court, however, does not give much weight to this evidence as it does not find it convincing and in many respects finds it to be irrelevant to the facts of this case.

## II. CONCLUSIONS OF LAW

### A. *Trademark Infringement*

■■■ Raymond alleges that Danly's sale and/or distribution of its IDENTI spring line will amount to infringement of its federally registered trademarks. U.S. Trademark Registrations Nos. 967,350, 967,351, 967,352 and 1,056,331 are each owned by Raymond and are incontestable pursuant to Section 15 of the Trademark Act of 1946, 15 U.S.C. § 1065.[23] (Stips. 4–8). In order to prevail on a trademark infringement claim, the "plaintiff must establish that (1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 192 (3d Cir.1990).

### 1. Scope of Raymond's Marks

■■ The trademarks alleged to be infringed in this case extend to actual three-dimensional die springs and claim color as a feature of the marks. The Court concluded in its Opinion of March 7, 1990 on plain-tiff's motion for a preliminary injunction that plaintiff's marks are not limited to two dimensional symbols and logos depicting a die spring and that they do claim color as a feature of the marks.[24] Danly no longer contends that the Raymond registrations do not claim color as a feature of the marks.[25] Danly does claim, however, that Raymond's registered marks are limited to colors applied to the entire die spring to support its argument that Raymond cannot appropriate the exclusive right to use these colors in any and all manners on die springs. (Defendant's Proposed Findings of Fact and Conclusions of Law ("DFFCL") at p. 48).

The applications filed on June 21, 1972, to register the trademarks stated that "[t]he mark is used by applying the color [red, gold (copper), green or blue] to the entire spring."[26] The registrations, as Raymond asserts, do not claim any particular pattern for the use of the four colors blue, red, gold (copper) and green. Further, the Court agrees with Danly that Raymond cannot appropriate the exclusive right to use these colors in any and all manners on die springs. However, it does not necessarily follow that the stripe of color used on the IDENTI spring cannot infringe Raymond's registered marks by virtue of it being but a stripe of color versus color covering the entire spring. The IDENTI spring with its stripe of color is still capable of infringing Raymond's marks. The fact that Raymond's marks are the colors red, gold, green and blue

---

**23.** *See* 15 U.S.C. § 1065 (describing prerequisites for incontestable status). The parties have stipulated to the incontestability of plaintiff's four trademark registrations. (Stip. 8). Since plaintiff's trademarks have acquired incontestable status, defendant's available defenses are limited to those specifically enumerated in section 33(b) of the Lanham Act, 15 U.S.C. § 1115(b). *Park'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 196, 205, 105 S.Ct. 658, 662–63, 667, 83 L.Ed.2d 582 (1985). In addition, section 14(c) of the Lanham Act, 15 U.S.C. § 1064(c) permits cancellation of an incontestable mark at any time if it has become "generic". *Id.* at 195. Section 14(c) of the Lanham Act, 15 U.S.C. § 1064(c) also permits cancellation of an incontestable mark at any time if the mark has been abandoned, if it is being used to misrepre-sent the source of the goods or services in connection with which it is used, or if it was obtained fraudulently or contrary to the provisions of § 4 of the Act, 15 U.S.C. § 1054, or §§ 2(a)–(c) of the Act, 15 U.S.C. § 1052(a)–(c).

**24.** *Barnes Group Inc. v. Connell Limited Partnership*, 15 U.S.P.Q.2d 1100, 1105–06, 1990 WL 25049 (D.Del.1990).

**25.** Since Danly did not pursue this argument at trial, the Court relies on its previous findings. *Barnes Group Inc.*, 15 U.S.P.Q.2d at 1105–06.

**26.** *See* Plaintiff's Exhibit 27 at 108; Exhibit 28 at 133; Exhibit 29 at 161; Exhibit 30 at 191 submitted in conjunction with Plaintiff's Motion for a Preliminary Injunction.

applied to the entire spring does not preclude infringement of the marks by anything other than a spring with 100% of its surface painted in those colors.

█ Defining the scope of plaintiff's marks is relevant but does not resolve the issue of infringement. Provided the marks are legally protectable the keystone of trademark infringement remains whether the use of the alleged infringing marks is likely to cause confusion.

### 2. Validity and Legal Protection

█ Under the common law and the Lanham Act, 15 U.S.C. 1051–1127, trademark owners are accorded protection against the use by others of marks which are likely to cause confusion. *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1228 (3d Cir.1978). However, not all marks qualify for legal protection. In an action for infringement the court must determine whether the trademark alleged to be infringed is inherently distinctive or has acquired sufficient secondary meaning to become distinctive and thus achieve protection. A non-distinctive trademark is not afforded protection by the law of trademark.[27] *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.1983); *Scott Paper Co.*, 589 F.2d at 1228.

█ A mark is either inherently distinctive or not inherently distinctive. The significance of a mark's level of inherent distinctiveness is the need to prove secondary meaning or "distinctiveness". 1 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 11:1 (2d ed. 1984). The courts have differentiated four categories of terms for the purpose of determining a mark's level of inherent distinctiveness. An arbitrary or fanciful mark does not have any logical or suggestive relation to the actual characteristics of the goods. A suggestive mark suggests but does not describe the characteristics of the goods to which it is attached. Marks found to be arbitrary or fanciful or suggestive qualify

for trademark protection without proof of secondary meaning. A descriptive mark describes a characteristic or ingredient of the product to which it refers. Such a mark can obtain trademark protection but proof of secondary meaning is necessary. Finally, a generic mark serves as a common descriptive name of a product class. A generic mark is never protectable and evidence of secondary meaning is not relevant. *A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 296–97 (3d Cir.1986) (citing *Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366, 374 n. 8 (1st Cir.1980)).

█ Raymond claims that its colors are valid trademarks at common law because they are arbitrary and hence inherently distinctive and have acquired distinctiveness through use (secondary meaning). (PFFCL at p. 74). Raymond points to the federal registrations for its trademarks as evidence of the validity and strength of its marks. Raymond's federal registrations for its trademarks are evidence that the marks are valid and legally protectable. *Institute for Scientific Information, Inc. v. Gordon & Breach Science Publishers, Inc.,* 931 F.2d 1002, 1006 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 302, 116 L.Ed.2d 245 (1991). As discussed in the following sections, the record supports the conclusion that Raymond's marks have achieved secondary meaning and are distinctive. The Court concludes that Raymond's marks are valid and legally protectable.

#### a. Raymond's Marks are Distinctive

█ Evidence of the distinctiveness of Raymond's marks was supplied by Dr. Jacoby's testimony concerning the arbitrariness of the marks. Dr. Jacoby testified that Raymond could have selected any colors from the vast spectrum of colors to represent the differing load ranges of its die springs. The particular color selections made by Raymond were completely arbitrary. There is no evidence in the record

---

**27.** To establish trademark infringement or unfair competition proof of the validity of a mark is required which can be demonstrated by showing that the mark is inherently distinctive or if

not inherently distinctive has acquired secondary meaning and has become distinctive. 1 J. Thomas McCarthy, *supra* § 15:1.

that these color selections were dictated by any existing associations between the colors selected and the identification of load classes for die springs. There is no industry standard in the United States for designating the load class of die springs.

The color coding of die springs provides a useful way of identifying load class. The usefulness of the Raymond marks does not, however, detract from their distinctiveness. "When a feature of the item is arbitrary, the feature may become a trademark even though it serves a useful purpose." *Artus Corp. v. Nordic Co., Inc.*, 512 F.Supp. 1184, 1188 (W.D.Pa.1981).

> Color alone or indiscriminately applied to the overall configuration of a product may not function as a trademark, [h]owever, when it is applied to goods in some definite, arbitrary manner or design, it can so function if it is used in the manner of trademark and it is recognized in the industry as identifying and distinguishing the source of the product in connection with which it is used.

*Artus Corp.*, 512 F.Supp. at 1188. In the present case the record shows that secondary meaning has attached to the selection and arbitrary application of the four colors blue, gold, green and red to the Raymond die springs. "Secondary meaning exists when the trademark is interpreted by the consuming public to be not only an identification of the product, but also a representation of the product's origin [and] [o]nce a trademark which could not otherwise have exclusive appropriation achieves secondary meaning, competitors can be prevented from using a similar mark." *Scott Paper Co.*, 589 F.2d at 1228.

In concluding that Raymond's marks have acquired secondary meaning the Court considered the extent of sales and the nature of advertising and promotion, buyer association, the length of use and the extent of copying. *Ciba–Geigy Corp. v. Bolar Pharmaceutical Co.*, 747 F.2d 844, 851–52 (3d Cir.1984) *cert. denied,* 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 696 (1985); *Ciba–Geigy Corp. v. Bolar Pharmaceutical Co.*, 547 F.Supp. 1095, 1113–14 (D.N.J. 1982), *aff'd per curiam,* 719 F.2d 56 (3d Cir.1983), *cert. denied,* 465 U.S. 1080, 104 S.Ct. 1444, 79 L.Ed.2d 763 (1984); *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.,* 685 F.2d 78, 82 (3d Cir.1982).

### 1. Advertising and Promotion and Sales

Secondary meaning can be established through extensive advertising. *Scott Paper Co.*, 589 F.2d at 1228. The record indicates that Raymond spends between $250,000 and $300,000 annually on advertising and promoting its die springs which bear the Raymond marks. An additional source of advertisement and promotion of the Raymond die springs is provided by the master distributors and sub-distributors. Furthermore, 60 to 70% of actual and potential customers of Raymond die springs are contacted by the personnel forces of Raymond and its distributors.

These promotional and advertising efforts by Raymond have been successful as evidenced by Raymond's annual sales of approximately $10 million. Furthermore, these efforts have resulted in a recognition in the minds of die spring purchasers and users that Raymond's trademarks identify load class and Raymond as the source of the die springs as distinguished from other die springs.

### 2. Buyer Association

In order "to establish secondary meaning it is not necessary for the public to be aware of the name of the manufacturer which produces a product; rather, it is sufficient if the public assumes that the product comes from a single though anonymous source." *Ciba–Geigy Corp.*, 547 F.Supp. at 1113 (quoting *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 856 (7th Cir.1982)). The Third Circuit has recognized that "owing to the ramifications of modern trade and international distribution of goods from the manufacturer to the jobber or importer and retailer to the consumer, the source or origin of the goods bearing a well-known trademark is seldom known to the consumer." *Family Circle, Inc. v. Family Circle Association, Inc.*, 332 F.2d 534, 539 (3d Cir. 1964).

Raymond markets and distributes its die springs through a system of licensed mas-

ter distributors and sub-distributors in an effort to supply the customer with a local, convenient and familiar source for its die spring needs. Therefore, the entity known to the purchaser and user may be the local distributor of Raymond die springs.

### 3. Duration of Use

Raymond has used its system of four colors since at least as early as 1963. The industry recognizes this system of four colors as the "Raymond colors". Raymond has registered its system of four colors with the U.S. Trademark Office.

### 4. Extent of Copying

The extent of copying and the purpose in copying are factors to be considered in determining whether secondary meaning has been acquired. *Ciba–Geigy Corp.*, 747 F.2d at 852.[28] "A product is generally considered to have acquired distinctiveness and secondary meaning when its trade dress has been copied." *Ciba–Geigy Corp.*, 547 F.Supp. at 1113. Danly has not copied Raymond's marks in their entirety. The IDENTI springs use only stripes of color corresponding to the colors of Raymond's marks. However, the record reveals that Danly's purpose behind adopting the colors of the Raymond marks for the IDENTI springs was to increase its sales of die springs.

### b. Raymond's Marks are not Generic

Danly claims that Raymond possesses no valid common law marks, and its registered marks are subject to cancellation, pursuant to 15 U.S.C. § 1064(3), because the primary significance of the colors applied to Raymond's springs relates to the springs themselves, and not their source. Specifically, Danly asserts that Raymond's trademarked colors have become the generic or common descriptive features for designating load class in the market of die springs such that they represent the load classes with which they are associated, rather than Raymond as the source. Since Raymond's trademarked colors are registered and have a presumption of validity, Danly has the burden of proving that Raymond's marks are generic and thus unprotectable. *A.J. Canfield Co.*, 808 F.2d at 299–300, n. 9.

In determining whether Raymond's trademarked colors are generic this Court has utilized the primary significance test which "instructs [the Court] to inquire whether a term primarily signifies the product or the producer ..." *A.J. Canfield Co.*, 808 F.2d at 300. This test is satisfied even if the consumers are unaware of the name or the producer of the product. *Id.* This test also recognizes "that trademarks need not indicate source exclusively, but may have a 'dual function—that of identifying a product while at the same time indicating its source.'" *Id.* (*quoting* S.Rep. No. 98–627, 98th Cong., 2d Sess. 5 (1984) *reprinted in* 1984 U.S.Code Cong. & Ad.News 5708, 5718, 5722). Raymond's trademarks can serve to designate load class while simultaneously designating Raymond as the source of the springs without being rendered generic since a mark maintains its validity even when serving such a dual function. *A.J. Canfield Co.*, 808 F.2d at 300. The colors blue, red, gold and green designate the load class of die springs but only if one first knows that it is the Raymond system of colors that is being utilized. Therefore, first and foremost, the Raymond scheme of colors, its marks, serve to designate Raymond as the source of the die springs.

In the case of *A.J. Canfield Co. v. Honickman*, 808 F.2d 291 (3d Cir.1986), the Court held that the designation at issue, "chocolate fudge" for a diet soda, was generic and hence unprotectable. The Court agreed with the district court that the term "chocolate fudge" denotes a particular full and rich chocolate flavor and that it appeared difficult if not impossible for a competing producer to convey to the public that its product shares the functional fla-

---

**28.** In this case the Third Circuit's discussion of copying as an indication that a product has acquired secondary meaning concerns the copying of the product's trade dress pursuant to a claim of unprivileged imitation. In the present case, plaintiff's federally registered trademarks which claim color, as applied to the entire die spring product, as a feature of the marks and its trade dress in colored springs are merged.

vor characteristic without using the designation "chocolate fudge". In the present case the record does not show that the Raymond colors denote particular load ranges for die springs or that it would be difficult for a competing producer of die springs to convey to consumers the four load ranges for its die springs without using the Raymond colors. The record reveals that there are other manufacturers of die springs, who are competitors of Raymond's, such as Danly, who have had success in the market with their respective color systems for designating load class. Color is but one way of denoting the load range of a die spring and Raymond's set of four colors represents but one scheme of the many possible schemes of colors available for such designations.

Finally, the record does not support the conclusion that Raymond's load range colors for die springs have become the industry standard. In fact, the record shows that there are not any industry standards for designating load range for die springs.

### c. Raymond's Marks are not Descriptive Symbols of Load Class

 Danly claims that its use of the Raymond colors on its IDENTI springs is in a descriptive sense and constitutes fair use under section 33(b)(4) of the Lanham Act, 15 U.S.C. § 1115(b)(4). Fair use is applicable as a defense to incontestability status if defendant establishes the following:

> That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business ... or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin; 15 U.S.C. § 1115(b)(4).

Use by the defendant in a non-trademark sense or a descriptive sense will support the fair use defense. 1 J. Thomas McCarthy, *supra* § 11:17, at 476.

Defendant argues that its use of the Raymond colors to signify load class is descriptive because the colors applied by Raymond to the various load classes of its die springs have become the generally accepted designators of those load classes for all die spring manufacturers. However, the record established at trial does not indicate that Raymond's colors have become descriptive symbols of load class. In its post trial brief the defendant relies on the cases of *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018 (7th Cir.1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980) and *Clarke v. Joseph H. Dahlkemper, Inc.*, 468 F.Supp. 441 (W.D.Pa.1979), as it did to support its fair use defense in reference to Plaintiff's Motion for a Preliminary Injunction. As the Court explained in its Opinion,[29] there was a finding by the court in each of these cases that the designations at issue had acquired descriptive meanings which were recognized and used throughout the relevant markets. This Court was unable to justify such a finding in the present case based on the record as it existed at the time of plaintiff's motion. Since, there was no additional evidence presented at trial which would now provide a basis for this Court to conclude that Raymond's colors have become the generally accepted means of designating load class for die springs, the Court cannot conclude that Danly's use of Raymond's colors constitutes fair use under section 33(b)(4) of the Lanham Act, 15 U.S.C. § 1115(b)(4).

### d. Raymond's Marks are not Functional Indicators of Load Class

Danly asserts that Raymond does not own common law trademarks because the colors serve as functional indicators of standard load class. In support of this claim Danly describes the evidence as proving that users of Raymond die springs view its color coding system as functional and Raymond's advertising as emphasizing the functional utility of the color designations. The Court can not agree with Danly's con-

---

29. *Barnes Group Inc.*, 15 U.S.P.Q.2d 1100, 1107–08, 1990 WL 25049 (D.Del.1990).

clusion that Raymond's marks are functional. The evidence presented at trial was not sufficient to support such a conclusion.

 As this Court stated in its Opinion,[30] the focus of the functionality inquiry is "whether a particular feature of a product or service is substantially related to its value *as a product or service, i.e.,* if the feature is part of the 'function' served, or whether the primary value of a particular feature is the identification of the provider." *United States Golf Association v. St. Andrews Systems,* 749 F.2d 1028, 1033 (3d Cir.1984) (emphasis original). The color applied to a Raymond die spring serves the useful purpose of designating load class of the die spring. The color of a die spring does not alter its mechanical function as a die spring. A die spring can be any color and still perform as a die spring. Any color can designate load. Raymond arbitrarily selected the color blue to represent the medium load class. Likewise, Raymond arbitrarily selected the colors red, gold and green to represent the medium-heavy, heavy and extra-heavy load classes respectively. Raymond's trademarked colors both alone and as a series of marks are arbitrary. There is no logical relationship or suggestive relationship between the colors blue, red, gold and green and the characteristics of a die spring unless one is familiar with Raymond's use of color to denote load class. The primary value of the colors of Raymond die springs is the identification of Raymond as the provider.

 Danly correctly recognizes that in order for a color to be recognized as a trademark it is required that the mark be (1) arbitrary; (2) nonfunctional; (3) possessed of secondary meaning; and (4) not a

bar to competition. *In re Owens–Corning Fiberglass Corp.,* 774 F.2d 1116, 1120–25 (Fed.Cir.1985). However, contrary to Danly's view of the facts the Court has concluded that Raymond's colors have not been proven to be functional indicators of load class, that Raymond has established secondary meaning for its colors and that there is not a substantial competitive need for Danly and other competitors of Raymond to use Raymond's load designating colors.[31]

### 3. Likelihood of Confusion

 A cause of action for the infringement of a federally registered trademark is provided for in 15 U.S.C. § 1114(1)(a) which will entitle a trademark infringement plaintiff to relief upon a showing that there is a likelihood of confusion as a result of defendant's use of its mark.[32] The plaintiff bears the burden of proving likelihood of confusion.[33] *American Home Prods. Corp. v. Barr Laboratories Inc.,* 834 F.2d 368, 371 (3d Cir.1987); *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 462 (3d Cir.1983).

#### a. Types of Confusion

 Trademark law provides a remedy for confusion as to source, affiliation, connection or sponsorship of a product or service. *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1229 (3d Cir. 1978); 2 J. Thomas McCarthy, *supra,* § 23:1. Plaintiff asserts that "product confusion" is also to be included among the types of confusion that are remediable under the Lanham Act. The plaintiff defines "product confusion" to be the use of a trademark or dress of goods sufficiently similar to the plaintiff's trademark or trade dress to cause the defendants' goods to be

**30.** *Barnes Group Inc.,* 15 U.S.P.Q.2d 1100, 1110, 1990 WL 25049 (D.Del.1990).

**31.** *See* Section II.A.3.b. *supra.*

**32.** Section 1114(1)(a) provides in pertinent part: Any person who shall, without the consent of the registrant—
(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection

with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided. 15 U.S.C. § 1114(1)(a).

**33.** Incontestability status does not relieve the trademark owner of the burden of demonstrating a likelihood of confusion within the meaning of 15 U.S.C. § 1114(1). *Park'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 205, 105 S.Ct. 658, 667, 83 L.Ed.2d 582 (1985).

confused with those of plaintiff. (PFFCL at 170).

The "product confusion" asserted by Raymond is confusion as to load class classification of the IDENTI springs. However, in the Court's view confusion as to load classification in not within the ambit of the trademark laws which are aimed at protecting the public against confusion and deception as to a product's origin. *Freixenet, S.A. v. Admiral Wine & Liquor Co.,* 731 F.2d 148, 151 (3d Cir.1984); *Scott Paper Co.,* 589 F.2d at 1228. Furthermore, confusion as to the load classification of the IDENTI springs does not fit plaintiff's own definition of product confusion which the Court interprets as ultimately involving confusion as to the source of the product.

The record indicates that in the event that selection of the wrong load class die spring were to occur the consequences could be costly and could include damage to expensive dies, improperly formed parts, worker injuries and production "downtime". Misplaced responsibility for such consequences appears to be the basis of Raymond's claim of product confusion. The evidence shows, however, that the parties die springs are distinguishable on the basis of their wire configuration. Also, the parties die springs are distinguishable by the addition of a stripe on the IDENTI spring. The testimony of plaintiff's expert in consumer psychology does not support the finding that the stripe will necessarily be overlooked. Therefore, the argument that selection of the wrong load class IDENTI spring will result in a likelihood of confusion as to the source of the die spring and Raymond's sponsorship of or responsibility for Danly's IDENTI die spring, is without merit. *Brandtjen & Kluge v. Prudhomme,* 765 F.Supp. 1551, 1568 (N.D.Tex.1991).

#### b. Determination of Likelihood of Confusion

■ "Likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service

identified by a similar mark." *Scott Paper Co.,* 589 F.2d at 1229. There are ten factors that this Court must consider in making the determination of whether a likelihood of confusion exists:

(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sale efforts are the same; (9) the relationship of the goods in the minds of the public because of similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.

*Id.* Based on an analysis of these factors the Court concludes that there is no likelihood of confusion in the present case.

1. The degree of similarity between the owner's mark and the alleged infringing mark

■ The degree of similarity between the Raymond die springs and the Danly IDENTI springs is a "subjective eyeball" test for the Court. *Farberware, Inc. v. Mr. Coffee, Inc.,* 740 F.Supp. 291, 297 (D.Del.1990). The Court has examined both the Raymond die springs and the Danly IDENTI springs. Despite the fact that both parties' products are a type of heavy duty compression spring called a die spring, the Danly IDENTI springs with a stripe of color against a background of solid color are visually distinct from Raymond's solid colored springs. Danly has established manufacturing specifications as to stripe width so that it remains visually clear which is stripe color and which is the background color. The parties' products

differ physically in terms of their wire configurations which also makes the two products visually distinctive. The typical user of the parties' die springs is a shop professional who can discern the differences in the wire shapes of the parties' springs. Also relevant is that the parties products are sold in distinctive packaging that identifies their sources and makes the products visual distinguishable. *American Home Prods. Corp.*, 834 F.2d at 371. The visual and physical dissimilarities between the Raymond die springs and the Danly IDENTI springs weighs against a finding of likelihood of confusion.

### 2. .Strength of owner's mark

■ The incontestable status of plaintiff's marks warrants their characterization as strong. *Dieter v. B & H Indus., Inc.*, 880 F.2d 322, 329 (11th Cir.1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990).

3. The price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase

The price of a die spring is relatively low but because the cost of the dies in which a die spring is used are extremely high and the consequences costly if an improper die spring is placed in a die, the purchasers of die springs are sophisticated and knowledgeable individuals who exercise great care in the purchase of die springs. The purchasers of the parties die springs generally refer to catalogs in making their purchasing decisions. The tool and die designer, a highly trained and educated craftsmen, uses his expertise in determining the die springs to be purchased and used in a particular die design. These circumstances weigh against a finding of likelihood of confusion.

4. The length of time the defendant has used the mark without evidence of actual confusion

The facts in this case show that there has been an overlap in the solid colors of the die springs produced by the parties for over twenty years. Specifically, Raymond and Danly have both used solid colored blue and solid colored red die springs for over twenty years to designate different load classes. There has been no evidence introduced to indicate that this overlap created any confusion as to the source of the parties' products. The likelihood of confusion between the parties solid colored springs, however, is not at issue in this case. The likelihood of confusion as to the Danly IDENTI spring is at issue and would seem destined to have the same market history as the solid colored springs since the addition of a stripe would seem to diminish the possibility of any confusion.

The Court recognizes that plaintiff may be correct in its view that there has been no real opportunity for confusion to develop from the introduction of IDENTI springs to the market. However, the circumstances of Omni Manufacturing Company's experience with the simultaneous use and storage of both the Raymond die springs and the IDENTI spring die springs, would seem designed to provide such an opportunity. Omni's experience showed that confusion as to the source and load class of the die springs did not occur.

Raymond's depiction of the confusion it foresees occurring in the workplace is without sufficient support in the record to be characterized as accurate. Based solely on the testimony of Dr. Jacoby the plaintiff would have the Court believe that workers will inevitably focus on the background colors of the IDENTI spring and not the smaller stripes, thereby mistaking the IDENTI springs for Raymond springs of different load classes and will be misled because of the psychological difficulty of overcoming perceptual interferences caused by the IDENTI spring.

The testimony of Dr. Jacoby was interesting as it employed a variety of cognitive tests and psychological demonstrations. However, Dr. Jacoby's opinions did not prove to be based on either actual experience or observations of the relevant workplace or worker. They are also not supported by data generated from research of the relevant workplace. The Court does not rely on Dr. Jacoby's testimony to illus-

trate that the IDENTI spring will cause a likelihood of confusion in the workplace. Furthermore, Raymond diminishes the value of Danly's teaching efforts based on Dr. Jacoby's opinion that many workers simply will not retain such directions. Danly's education of users of the IDENTI spring is not to be ignored. In the Court's view Danly's educational efforts would seem to reduce the potential for confusion.

### 5. The intent of the defendant in adopting the mark

█ It does not appear that it was Danly's intent to copy Raymond's marks. The defendant has not copied plaintiff's mark exactly, but instead has made its product distinguishable with the addition of a stripe. In any event, defendant's intent does not relieve plaintiff of its burden of proving likelihood of confusion. At most it is a factor tending to suggest likelihood of confusion and does not warrant a presumption of likelihood of confusion. *American Home Prods. Corp.*, 834 F.2d at 371.

### 6. The evidence of actual confusion

█ As discussed above in Section II. A.3.b.4., there is no evidence of actual confusion as to source or to sponsorship in this case. However, proof of actual confusion is not necessary. *Opticians Assn. of America v. Independent Opticians of America*, 920 F.2d 187, 195 (3d Cir.1990); *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 142 (3d Cir.1981).

### 7. Whether the goods are marketed, though not competing, through the same channels of trade and advertised through the same media

The evidence shows that the parties' springs are marketed through the same channels of trade and to the same class of consumers. These factors would tend to support a likelihood of confusion. However, the weight of these factors is diminished by other circumstances of this case which show that the channels of trade are being flooded with information which would allow the targeted consumers to un-

derstand the concept behind the IDENTI spring and recognize its source.

Danly has used significant efforts to educate the market about the use of the IDENTI spring and the meaning and interpretation of its stripes. In addition, Raymond's personal contact through its sales forces and those of its distributors with a majority of the purchasers in the market would serve as another source of education and clarification as to the use of the IDENTI springs. Also, both parties' springs are portrayed and described in informative catalogs which many users utilize when purchasing die springs. Finally, both parties' die springs are sold in distinctive packaging which identifies the source of the product.

### 8. The extent to which the targets of the parties' sale efforts are the same [34]

### 9. The relationship of the goods in the minds of the public because of similarity of function

The Raymond die springs have achieved secondary meaning in the marketplace in that the market recognizes Raymond's colors as signifying Raymond as the source of its solid colored die springs. The evidence does not show that the market mistakenly perceives the Danly IDENTI spring as also originating from Raymond. The market appreciates that the parties' die springs are related as to function but not source.

### 10. Other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market

There was no evidence introduced at trial to indicate that die spring purchasers believe Raymond to be the source of the IDENTI springs. Despite the fact that the stripes of the IDENTI springs are in the same colors as the Raymond solid colored die springs the market distinguishes the springs as originating from different sources.

### B. Unfair Competition

█ The law of unfair competition encompasses the law of trademarks. 1 J. Thomas McCarthy, *Trademarks and Un-*

---

**34.** *See* discussion in section II.A.3.b.7.

*fair Competition*, § 2:2 (2d ed. 1984). Plaintiff alleges that the defendant's use of plaintiff's colors to indicate load class constitutes unfair competition and a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[35] Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) encompasses acts that would constitute trademark infringement and unfair competitive practices. *SK & F, Co. v. Premo Pharmaceutical Laboratories, Inc.*, 625 F.2d 1055, 1065 (3d Cir.1980). Section 43(a) provides a cause of action for unprivileged imitation, including trade dress infringement. *American Greetings Corp. v. Dan–Dee Imports, Inc.*, 807 F.2d 1136, 1140 (3d Cir.1986).[36]

■ To establish a protected right in its trade dress, plaintiff must show that the "feature or overall combination of features imitated is non-functional, that it has acquired secondary meaning, and that members of the consuming public are likely to confuse the source of the product bearing the imitating feature or combination with the source of the product bearing the imitated feature or combination." *Id.* at 1141. As previously discussed, the Court has concluded that Raymond's colors are not functional indicators of load class. Also the Court has concluded that Raymond's colors have acquired secondary meaning since they serve primarily to identify Raymond as the producer of the springs.

As with trademark law, the law of unfair competition is aimed at avoiding the likelihood of confusion of the consumer as to source. *American Home Prods. Corp. v.*

*Barr Laboratories, Inc.*, 834 F.2d 368, 371 (3d Cir.1987); *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 151 (3d Cir.1984); 1 J. Thomas McCarthy, *supra*, § 2:2. The relevant considerations in trade dress cases are encompassed in the ten factors of *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir.1978) adopted by the Third Circuit for making the "likelihood of confusion" inquiry in trademark cases. *Farberware, Inc. v. Mr. Coffee, Inc.*, 740 F.Supp. 291, 297 (D.Del.1990). As the Court's previous discussion of these factors indicates the record does not prove the requisite likelihood of confusion.

### C. *Dilution*

■ Raymond claims pursuant to the Delaware antidilution statute, 6 *Del.C.* § 3313, that Danly's use of Raymond's colors on its IDENTI springs dilutes the distinctive quality of the Raymond colors. The Delaware antidilution statute provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties, or the absence of confusion as to the source of goods or services.

6 *Del.C.* § 3313. A finding of dilution under New York's antidilution statute, N.Y.Gen.Bus.Law § 368–d, which is identical to Delaware law, requires that plain-

---

**35.** This provision provides the following:

(a) any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or

her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). This is the version enacted on November 16, 1988 to take effect November 16, 1989, after the present action was filed. *See* Pub.L. 100–667, Title I, §§ 132, 136, 102 Stat. 3946, 3948. The Court, for purposes of this case, considers the relevant analysis the same under the above amended statute and the "old" statute that existed when the complaint was filed.

**36.** The Court characterizes plaintiff's claim as one of trade dress infringement.

tiff's mark possess a distinctive quality capable of dilution and that plaintiff show a likelihood of dilution. *Mead Data Cent., Inc. v. Toyota Motor Sales, Inc.*, 875 F.2d 1026, 1030 (2d Cir.1989). However, the plaintiff is not required to show that competition exists between its product and that of the defendant or that a likelihood of confusion as to the source of goods exists. *Id.*[37]

Proof of distinctiveness necessary to satisfy the antidilution statutes typically is the same proof used to show inherent or acquired distinctiveness for infringement purposes under the Lanham Act. *Mead Data Cent., Inc.*, 875 F.2d at 1030; *P.F. Cosmetique, S.A. v. Minnetonka, Inc.*, 605 F.Supp. 662, 672 (S.D.N.Y.1985). The Court concluded for purposes of plaintiff's infringement claim that its marks are distinctive and have acquired secondary meaning. Therefore, Raymond's marks are of sufficient distinctive quality to be subject to dilution. Raymond fears that its marks could become diluted to the point of becoming "industry standard" colors for designating load class. (PFFCL at p. 56). It remains for this Court to determine whether there is a likelihood that Danly's use of its marks will dilute the distinctive quality of Raymond's marks.

Dilution can be defined as a "blurring of a mark's product identification or the tarnishment of the affirmative associations a mark has come to convey." *Mead Data Cent., Inc.*, 875 F.2d at 1031.[38] As discussed above, some mental association between the marks is necessary for a dilution claim. It is this association that may blur the distinctiveness of plaintiff's marks. The record does not support the conclusion that such an association exists in this case. The defendant's use of its marks is visually distinct from Raymond's marks and thus tends to reinforce the distinction between the products. These is also no evidence to

support a conclusion that Danly's use of its marks would tarnish the affirmative associations the Raymond marks convey.

### D. *Monopolization Claim*

■ Defendant claims that plaintiff's alleged pattern of threatening and instituting lawsuits against its competitors constitutes trademark misuse and a violation of section 2 of The Sherman Antitrust Act. Defendant cites the case of *G. Heileman Brewing Co. v. Anheuser–Busch, Inc.*, 676 F.Supp. 1436, 1472 (E.D.Wis.1987), *aff'd*, 873 F.2d 985 (7th Cir.1989), for a definition of the type of conduct which will constitute a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. In this case the Seventh Circuit stated that "[a] company attempts to monopolize in violation of Section 2 when it engages in a course of conduct which would, if successful, accomplish monopolization, and which, though falling short, so closely approaches monopolization as to create a dangerous probability of it." *Id.* The court went on to explain that a determination as to whether a trademark is being unlawfully used to confer a monopoly in a certain product in violation of Section 2 of the Sherman Act requires that the accused's "actions have led to or resulted in a dangerous probability that it will gain a monopoly over the relevant market." *Id.* at 1473. In order to prove that the [plaintiff] "possessed sufficient power to come dangerously close to achieving monopoly power, the [defendant] must prove the relevant geographic and product markets within which that dangerous probability occurred." *Id.* at 1474.

In the present case the defendant has failed to offer sufficient evidence to define the relevant geographic and product markets and thus can not establish that Raymond possesses sufficient power. *American Bearing Co., Inc. v. Litton Industries, Inc.*, 729 F.2d 943, 949 (3d Cir.), *cert. de-*

---

**37.** Under the dilution theory *"some kind of mental association* in the reasonable buyer's mind between the two party's uses of the mark [is presumed] but the kind of mental association is *not* the strong, direct association and connection made when one concludes that buyers are likely to be so confused that they think that

defendant is somehow connected with, or sponsored by, the plaintiff." 2 J. Thomas McCarthy *supra,* § 24:13 at 214. (emphasis in original).

**38.** *See* 2 J. Thomas McCarthy, *supra,* § 24:13 (compiling cases which attempt to articulate the nature of dilution).

*nied,* 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984). Danly failed to show that the relevant geographic market is limited to the United States and that the relevant product market is limited to die springs.

Defendant alleges that Raymond has threatened or instituted trademark infringement suits with the specific intent of monopolizing the relevant market. Specific intent to monopolize the relevant market is a necessary element of defendants section 2 claim which cannot be inferred in the present case because defendant has failed to define the relevant markets and cannot prove that plaintiff possesses actual monopoly power. *Fleer Corp. v. Topps Chewing Gum,* 658 F.2d 139, 153–54 (3d Cir. 1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982). In addition, such intent is not proven by the evidence. Based on the record in this case the Court cannot conclude that Raymond's litigation practices are aimed at anti-competitive goals. In the Court's view Raymond's practices are efforts to protect its trademarks against infringers. The Court cannot conclude that Raymond's "resort to the courts is in bad faith and a mere sham" for which antitrust liability should be imposed. *Columbia Pictures Industries, Inc. v.*

*Redd Horne, Inc.,* 749 F.2d 154, 161 (3d Cir.1984).

### E. Cancellation of Danly's Registrations

■ Raymond seeks to have this Court cancel Danly's four federally registered trademarks covering the use of bands of the colors blue, red, gold and green on die springs [39] on the grounds that the registrations were abandoned and that the registrations are confusingly similar to Raymond's four registered trademarks at issue in this case. The Third Circuit has said that a claim of trademark abandonment "must be strictly proved." *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 139 (3d Cir.1981). In order to prove abandonment, Raymond was required to show both nonuse of the striped marks and intent not to resume use. 15 U.S.C. § 1127(a).[40]

■ Raymond did not attempt to prove intent not to resume, but rather relied upon the statutory inference of such intent that follows from two years' consecutive nonuse. 15 U.S.C. § 1127(a). However, Raymond has not proven two years of nonuse. The record shows that the marks were used in 1986 [41], and continuously from 1989 to present. The record does not show either use or nonuse between 1986 and 1989.[42]

39. In 1989, defendant acquired IEM, Ltd., which was the owner of the following four trademark registrations ("Coils Registrations") originally issued to the predecessor company Coils, Inc.:
 a. Reg. No. 1,422,546, issued December 30, 1989 for a stripe of the color blue on the perimeter of a coil spring and the letter L for "coil springs for use as die springs".
 b. Reg. No. 1,421,733, issued December 23, 1986 for a stripe of the color red on the perimeter of a coil spring and the letter S for "coil springs for use as die springs".
 c. Reg. No. 1,421,740, issued December 23, 1986 for a stripe of the color gold on the perimeter of a coil spring and letter I for "coil springs for use as die springs".
 d. Reg. No. 1,421,741, issued December 23, 1986 for a stripe of color green on the perimeter of a coil spring and the letter H for "coil springs for use as die springs".
Defendant became the owner by assignment of each of these registrations as a result of its acquisition of IEM, Ltd. and then recorded the assignments in the United States Patent and Trademark Office. (Stips. 11, 12).

40. This provision provides:
 A mark shall be deemed to be "abandoned"— (a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from the circumstances. Nonuse for two consecutive years shall be prima facie abandonment.
 15 U.S.C. § 1127(a).

41. Each of the Coils Registrations contains a claimed date of first use of the trademark shown therein of February 19, 1986. The use consisted of a sale of four springs (one for each of the claimed trademarks) for a total of $18.75. (Stip. 13).

42. The Court agrees with defendant that it was plaintiff's burden strictly to prove two years' consecutive non-use of the marks covered by the Coils Registrations in order to avail itself of the statutory presumption of intent not to resume. 15 U.S.C. § 1127. The Court views defendant's citation to *P.A.B. Produits v. Satinine Societa,* 570 F.2d 328 (C.C.P.A.1978) appropriate and agrees that when the record is silent there is no

The Court relies on its discussion in Section II.A.3. upon which to base its conclusion that there is no likelihood of confusion between Raymond's registered trademarks and the registrations owned by Danly which Raymond seeks to have canceled.

## III. CONCLUSION

In summary the Court concludes that Danly's sale and distribution of its IDENTI springs does not constitute infringement of Raymond's U.S. Trademark Registration Nos. 967,350, 967,351, 967,352 and 1,056,-331 since the use of colored stripes on Danly's IDENTI springs is not likely to cause confusion with either Raymond's registered marks or its common law marks. Further, Connell's counterclaim for cancellation of Raymond's trademark registrations is dismissed as they have not become generic indicators of load classes of the die springs on which they are used. Barnes' claim for cancellation of Connell's U.S. Trademark Registration Nos. 1,422,546, 1,421,733, 1,421,740 and 1,421,741 is dismissed. The Court also concludes that the use of colored stripes on Danly's IDENTI springs does not constitute unfair competition with Raymond and is not likely to dilute any distinctive quality of Raymond's marks. Finally, Connell's counterclaim for monopolization pursuant to Section 2 of the Sherman Act is dismissed.

basis for inferring non-use. (Defendant's Reply Brief at pp. 5–6).